**BURKHART ADVERTISING, INC., et al., Plaintiffs,**

v.

**CITY OF AUBURN, INDIANA et al., Defendants.**

Civ. No. 90–9.

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 19, 1991.

Bruce O. Boxberger, John J. Wernet, T. Dean Swihart, Fort Wayne, Ind., for plaintiffs.

Kevin L. Likes, Asst. Auburn City Atty., Auburn, Ind., for defendants.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on cross motions for summary judgment. The issues have been fully briefed. For the following reasons the plaintiffs' motion for summary judgment will be granted in part and denied in part. Defendants' motion for summary judgement will be denied in part and granted in part.

## SUMMARY JUDGMENT

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rather, Rule 56(c) places an affirmative burden on the non-moving party and mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*, 106 S.Ct. at 2512; *In re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Tp. High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir. 1986).

■ Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact, *Celotex*, 106

S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 106 S.Ct. at 2511.

 Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 106 S.Ct. at 2512.

## FACTUAL BACKGROUND

The filings of the parties have established without contravention the following facts. The plaintiffs are Burkhart Advertising, which is in the billboard advertising business, and Forrest Scott, a resident of Auburn, Indiana, and an owner of real estate within the city limits of Auburn. Defendants include the city of Auburn, an Indiana municipal corporation, and members of the DeKalb County Plan Commission, Auburn City Council, and Mayor of Auburn.

Burkhart engages in the business of providing off-premise billboards for both commercial and non-commercial speech. To do this, Burkhart must lease real property from property owners such as Mr. Scott. In fact, Burkhart has entered into a lease agreement with Scott for the placement of a standardized outdoor advertising structure on property owned by him. This would amount to the erection of an off-premise billboard. "Off-premise" billboards are generally defined as billboards which advertise or promote a business purpose or other activity not associated with any business or activity on-going at the site of the billboard.

For approximately the past fifteen years, the city of Auburn has had a zoning ordinance in place banning all off-premise billboards within the city limits. Because of Auburn's increased growth industrially, residentially, and commercially, the city of Auburn commissioned a Comprehensive Master Plan in 1986 to replace the Master Plan prepared in 1965 and "to insure that future growth and development in Auburn will be planned in an orderly manner." On or about November 8, 1988, the DeKalb County Plan Commission approved a comprehensive zoning ordinance to replace the prior one. On this date, it recommended action on the new zoning ordinance by the Auburn City Council.

The new comprehensive zoning ordinance continued the ban on off-premise billboards within Auburn. Zoning exceptions to the prohibition include exemptions for public or governmental signs, window signs, real estate signs, portable signs, plus other categories. However, the zoning exceptions do not include off-premise advertising billboards. The Auburn City Council held hearings on the proposed new zoning ordinance on January 17 and January 24, 1989.

The new zoning ordinance was subsequently approved by the City Council on its third and final reading on February 7, 1989. Auburn's Mayor, Burtis L. Dickman, signed the ordinance on February 10, 1989,

and final passage of the ordinance was approved by the Common Council of the City of Auburn on March 21, 1989.

On cross-summary judgment motions, the following issues have been presented for the court's determination: (1) whether Auburn's zoning ordinance satisfies the constitutional standards necessary to restrict commercial speech?; (2) whether the ordinance unconstitutionally prohibits noncommercial speech?; (3) whether alternative markets (channels of communication) are sufficient such that the ordinance is a valid time, place, and manner restriction on First Amendment rights?; (4) whether defendants, if the ordinance is found unconstitutional, are subject to sanctions under 42 U.S.C. Section 1983? and; (5) whether the zoning ordinance violates the Indiana Code regulating billboards and Article I, Section 9 and Article I, Section 23 of the Indiana Constitution?

Plaintiffs seek declaratory judgment that the complete ban of off-premise billboards is unconstitutional and therefore unenforceable, the award of reasonable attorney fees, and the assessment of all costs against defendants. Defendants seek summary judgment on all issues raised in plaintiffs' complaint or, if the court finds that the defendants are not entitled to summary judgment on all claims, then, that defendants are entitled to partial summary judgment as pertains to plaintiffs' section 1983 claims.

## DISCUSSION

The court finds that it has jurisdiction over the instant matter under § 1331 and § 1343 of 28 U.S.C.

1. In *Metromedia,* the Court struck down a San Diego ordinance that prohibited most outdoor advertising signs. The ordinance exempted two types of signs: (1) "onsite signs," defined as signs "designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed:" and (2) certain specific types of signs, described by the Court as including "government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, but not used for advertising purposes; commemorative

1. *Is Ordinance a Valid Restriction of Commercial Speech?*

a. The General Standard

When a party attempts to regulate speech, even commercial speech, through legislation, then that party has the obligation of carrying the burden in justifying it. *National Advertising Co. v. Town of Babylon,* 900 F.2d 551, 555 (2nd Cir. 1990). With respect to the regulation of commercial speech, the U.S. Supreme Court in *Metromedia v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) reiterates the test for constitutionality of statutes found in the seminal case of *Central Hudson Gas & Electric Corporation v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980):

> (1) The First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective.

*Metromedia,* 101 S.Ct. at 2892.[1]

b. Commercial Speech Must Concern Lawful Activity

The defendants do not allege that the type of commercial speech that plaintiff Burkhart wishes to promote is unlawful. Burkhart seeks to provide "standardized historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision direction signs; and '[t]emporary political campaign signs.'" 101 S.Ct. at 2886. The City of Auburn's ordinance is very similar in scope to the San Diego one. *See* Ordinance 89–1 (City of Auburn) § 150.440.

The Court in *Metromedia* found that the ordinance was unconstitutional, but was unable to reach a majority as to the reasoning. The four-Justice plurality (White, Stewart, Marshall and Powell) believed that a complete ban on com-

outdoor advertising signs to present the business, political, personal, charitable, and public service messages of itself and others." *See* Plaintiffs' Complaint, Count One. The parties do not dispute that the commercial speech in question concerns a lawful activity and, therefore, for the purposes of this case the court recognizes that the speech is deserving of at least some First Amendment protection.

### c. Is There a Substantial Governmental Interest?

The twin goals of traffic safety and city aesthetics have long been held as substantial governmental interests. *See Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

The defendants contend that the purposes of the ordinance, which includes the total ban on off-premise billboards, are to promote "city wide ascetics [sic], improve or prevent traffic concerns, avoid visual clutter and promote safety". *See* Defendants' Memorandum in Support of Motion for Summary Judgment, at 6.

The plaintiffs argue that these stated reasons were not ones seriously considered by the defendants at the time they adopted the ordinance, nor are these interests found in the ordinance itself. Rather, plaintiffs submit that the "safety and aesthetical" reasons given by the defendants are a "liberal paraphrasing" of their true intent and a recent distortion prompted by the defendants' reliance on case law. *See* Plaintiff's

Brief in Opposition to Summary Judgment Motion, at 4.

The court finds that there is no issue of material fact with regard to whether safety and aesthetics were legitimate concerns of the defendants. First, while the signage ordinance language is worded broadly, it conveys the general intent to address traffic (safety) and aesthetic concerns. The Preamble (Purpose) to the signage ordinance states that:

> Signage regulations are intended to promote the public health, safety and welfare by regulating existing and proposed signs. They are also intended to protect property values and reduce potential hazards while creating a positive economic and business environment.

Secondly, the defendants did consider the matters of safety and aesthetics in their deliberations of whether to retain a ban on off-premise signage. A number of defendants and area residents spoke about these concerns at the January 17 and January 24, 1989, City Council meetings. *See* Exhibit 2 (partial transcript of January 17 hearing), at 47, 52, 67–68, 80, 84, 89, 97, 106, and; Exhibit 3 (partial transcript of January 24 hearing), at 2, 10, 11, 14, 15, 16, 17, 20. Moreover, Councilman Richard Ring stated concerns over safety and aesthetics in his deposition. *See* Deposition of Richard Ring, at 15–17.

Auburn's Mayor did admit that no formal studies were conducted to evaluate whether off-premise signage might create safety problems. *See* Deposition of Burtis L. Dickman, at 16. However, members of the City Council and Mayor testified that they did consider informal comments in the form

---

mercial signs would be permissible. 101 S.Ct. at 2895. However, they believed that the ordinance was invalid because it discriminated among signs on the basis of their content: it drew an impermissible distinction between commercial and noncommercial onsite advertising (permitting the former but not the latter), *Id.* and it permitted certain types of noncommercial signs while prohibiting other noncommercial signs. *Id.* 101 S.Ct. at 2896–97. Two Justices (Brennan and Blackmun) disagreed with the plurality's finding that the ordinance drew content-based distinctions, but believed that the ordinance was invalid because the city

had failed to adequately justify the restrictions on free speech. *Id.* 101 S.Ct. at 2903. Three Justices (Burger, Stevens and Rehnquist) agreed with the plurality that a total ban on off-site commercial billboards would be permissible, but disagreed with the plurality's conclusion that the ordinance drew impermissible content-based distinctions. *Id.* at 101 S.Ct. 2916–17 (Stevens); *Id.* 101 S.Ct. at 2917–24 (Burger); *Id.* 101 S.Ct. at 2924–25 (Rehnquist). Accordingly, they would have upheld the ordinance. *See also Scadron v. City of Des Plaines,* 734 F.Supp. 1437 (N.D.Ill.1990).

of letters and phone calls from city residents about safety and aesthetic concerns. *See* Depositions of Betsy Carbaugh, Paul Trausch, Burt Dickman. Moreover, the court traditionally gives deference to the determinations of lawmakers regarding these matters. *See Metromedia,* 101 S.Ct. at 2893 and *infra* at 728.

Thirdly, in 1986 the City Council commissioned the "Comprehensive Master Plan" to study the city's growth. The survey revealed that "improved traffic flow" was the top priority of 16 possible projects and almost 50% of respondents identified "more controlled traffic" as the most needed improvement for the retail strip along Route 8. *See* Exhibit 1 (Comprehensive Master Plan), Figures 1 and 5. Limiting the number of billboards could presumably help address this problem as well as mitigate congestion and traffic safety problems. Moreover, the survey found that the areas in Auburn that respondents thought needed the most improvement in appearance was the commercial strip along Highway 8 and the entrances to the city. *See* Plaintiff's Exhibit 1. The survey recommended that "the city needs to monitor commercial land use carefully in this area". *See* Exhibit 1, at 73. Presumably reduction of signage is one such way of restricting land use and improving the appearance of areas over which residents had the greatest concern.

The plaintiffs have not raised a sufficient doubt to call into question the seriousness of defendants' deliberations about the issues of safety and aesthetics. Therefore, the court finds that there is no issue of material fact with regard to whether defendants have a substantial governmental interest sufficient to satisfy the second test of *Central Hudson* and *Metromedia.* Clearly they do have such an interest.

### d. Does the Ban Directly Advance Governmental Interests?

The plaintiffs further contend that defendants have failed to show that the ordinance *directly advances* the stated governmental interests of promoting safety and aesthetics, the third requirement under the *Central Hudson* four-part test. Specifically, the plaintiffs argue that "the area most identified as visually blighted by the Defendants [the west commercial strip along Route 8] is unchanged as a result of the ordinance." Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment, at 16.

The defendants argue that the ordinance does directly advance its objectives of safety and aesthetics. Defendants refer to several instances in the transcripts of City Council meetings and in depositions of defendants to support their contention that they, at least, believed that by prohibiting off-premise billboards they would be directly advancing these two objectives. *See supra.*

The court notes that traditionally a low threshold standard has been applied in scrutinizing lawmakers' determinations on the matter of safety. In *Metromedia,* the Supreme Court held:

> We ... hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable. 101 S.Ct. at 2893.

*See also Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1948). Auburn's Mayor and members of the City Council also testified that safety was a major concern in their minds when approving the ban on off-premise billboards. Deposition of Burtis L. Dickman, at 16, 26; Deposition of Betty Carbaugh, at 36–37; Deposition of Richard Ring, at 17. They further testified that they believed that a limitation on signage would create less distractions to motorists and therefore promote safety. *Id.*

Specifically, Councilman Richard Ring expressed concerns about the "sign explosion" that Auburn has recently experienced. He stated that he believed that an increase in the amount of signage could well cause a motorist to "miss speed signs, dangerous intersection signs, curve signs, stop lights, [and] he could miss [seeing]

pedestrians." Deposition of Richard Ring, at 17. These concerns are legitimate ones and a reduction in the amount of signage would, from a common sense perspective, appear to promote directly safety along roadways that are potentially cluttered with signage.

■ The matter of "esthetics" requires a higher standard of proof, however, than the promotion of safety concerns. This is true because "aesthetic judgments are necessarily subjective" and there is a greater likelihood that such a reason is merely a "public rationalization of an impermissible purpose." *Metromedia*, 101 S.Ct. at 2894.

In the instant case, it would be very difficult for defendants to show how worse off the aesthetical aspects of the town would be if off-premise signage were allowed, because the total ban has existed for at least fifteen years. In short, there is no history upon which the defendants can point to show that allowing off-premise signage would substantially detract from the visual appearance of the town. Nonetheless, common sense would lead one to the conclusion that by banning off-premise signs this would mitigate or, at least, not exacerbate sign "clutter" and, therefore, promote aesthetics.

Obviously, a number of ways of limiting the quantity or size of signs would also promote defendants' purpose. The fact that defendants have chosen to eliminate off-premise billboards even though other methods, such as a ban of all billboards, would more directly advance the governmental interests of safety and aesthetics does not mean that this lesser method is *per se* prohibited. *See Railway Express Agency v. New York*, 69 S.Ct. at 466 ("the fact that New York City sees fit to eliminate from traffic [trucks that carry advertising not related to business of owner of trucks] ... but does not touch what may be even greater [distractions], such as the vivid displays on Times Square, is immaterial.").

Therefore, the court finds that no issue of material fact exists regarding whether the total ban directly advances the defendants' stated interests in safety and aesth-etics. The ordinance does *directly advance* these governmental interests and, therefore, it passes the third of the *Central Hudson* four-part test.

**e. Is the Ordinance Narrowly Tailored?**

The plaintiffs also contend that defendants have failed to show why less restrictive measures other than a total ban could not accomplish defendants' governmental interests. Specifically, plaintiffs argue that adequate sizing and spacing restrictions would remedy the concerns plaintiffs raised for adopting the complete prohibition of off-premise billboards to begin with.

Defendants submit that "there exists no rational method other than a strict prohibition to limit the number of billboards within the city confines" in order to reach objectives of safety and aesthetics. *See* Defendants' Memorandum in Support of Motion for Summary Judgment, at 7.

The Supreme Court in *Central Hudson* held that if the government interest can be served as well by a more limited restriction on commercial speech, the excessive restriction cannot survive. 100 S.Ct. 2343, 2351 (1980). ("the First Amendment mandates that speech restrictions be 'narrowly drawn' ... The regulatory technique may extend only as far as the interest it serves"); *see also Chicago Newspaper Publishers v. City of Wheaton*, 697 F.Supp. 1464 (N.D.Ill.1988) ("In enacting a total ban on residential newsracks, Wheaton has not demonstrated that they have adopted the least restrictive means available.")

In *Metromedia*, the concurring Justices wrote:

> In the case of billboards, I would hold that a city may totally ban them if it can show that a sufficiently substantial governmental interest is directly furthered by the total ban, and that any more narrowly drawn restriction, i.e., anything less than a total ban, would promote less well the achievement of that goal.

101 S.Ct. at 2903 (Brennan and Blackmun J.)

The court is not convinced that a total ban of off-premise billboards is the most "narrowly drawn restriction" that could accomplish defendants objectives of improving safety and aesthetics. *See e.g., Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2303–04, 33 L.Ed.2d 222 (1972) ("Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest.") Nor have defendants shown why an outright ban of off-premise billboards is the only effective approach to solving these two stated problems. Moreover, it is unclear why the establishment of suitable spacing, size, height, set-back, and lighting regulations and other appropriate restrictions could not adequately address the defendants' legitimate concerns.

For instance, members of both the De-Kalb County Plan Commission and Auburn City Council admitted that certain concerns associated with off-premise billboards, namely size and placement, could be effectively controlled by regulations which are similarly imposed on on-premise signs. *See* Deposition of Tim Ehlerding, at 25, 26; Deposition of Paul M. Trausch, at 9, 10. Moreover, there is no explanation why other concerns raised could not also be addressed by adequate regulations, i.e., signs in areas where pedestrians might collide with the sign while shopping; billboards which obstruct the view of adjoining landowners. *See* Interrogatories 2, 7, and 8.

Furthermore, Auburn's signage ordinance already includes regulations that, at least in part, address defendants' safety concerns. Such regulations included under 150.430 read:

5. Any sign that is deemed a traffic hazard for reason of obstructing the view of an approaching road or intersection, railroad, school playground or park pedestrian crosswalk or any other situation that may endanger health and welfare of any pedestrian or occupant of any vehicle shall be prohibited.

8. No sign shall extend over a public right-of-way.

9. Any sign that is flashing, strobing, blinking, rotating, or blinding or distracting to pedestrians or occupants of motor vehicles shall be prohibited.

The Auburn signage ordinance prohibiting all off-premise billboards is not sufficiently tailored to accomplish defendants' governmental interests. It fails the fourth test of *Central Hudson* on the basis that it is more extensive than is necessary.

The court recognizes that in finding Auburn's ordinance not narrowly tailored that this finding goes against the decision in *Metromedia,* which held that a very similar type of ordinance was not more broad than necessary. However, *Metromedia* involved a city ordinance that banned off-premise billboards in San Diego, California. One distinguishing factor between the instant matter and the facts in *Metromedia* is the problem that city planners may have in a large, sprawling city, as opposed to a small town, in enforcing restrictions on billboard placement, sizing, spacing, and lighting.

It may well be that in San Diego, a large metropolitan area of several hundred thousand people, that the "most direct and perhaps only effective approach to solving the problems they [off-premise billboards] create is to prohibit them." *See Metromedia,* 101 S.Ct. at 2893. But these obstacles in Auburn, a town of only several thousand people, would be presumably slight in comparison. Burkhart seeks only to place off-premise billboards in commercial and industrial areas, not residential. This would further limit any additional regulatory or enforcement measures that the defendants would need to take. Currently the off-premise signage ordinance applies to the entire area within Auburn's city limits.

Furthermore, Burkhart proposes to work with defendants to place such off-premise billboards in a manner that would respect the city's legitimate concerns over safety and aesthetics. The defendants repeatedly stated in their depositions and brief that the areas of greatest concern are East and West Seventh Street, east and west of the City of Auburn. *See* Deposition of Betty Carbaugh, at 37; Deposition of Richard

Ring, at 15. The evidence suggests that the city could allow off-premise signage along these stretches of roadway without jeopardizing the city's legitimate concerns over safety and aesthetics.

In conclusion, it would appear that both parties' objectives could be accomplished through simply a more refined signage ordinance, one that addresses proper spacing, set-back, sizing, height, and lighting regulations of off-premise billboards. At the very least, the city has not shown why a complete ban is the only and least restrictive method available in promulgating their governmental interests. Therefore, the plaintiffs' motion for summary judgment is granted on the issue that the total ban of off-premise billboards is an unconstitutional limitation on commercial speech.

## 2. *Does Ordinance Violate Non-commercial Speech Protections?*

■■■ Plaintiffs contend that the ordinance is also unconstitutional under the First and Fourteenth Amendments because even non-commercial speech is prohibited under the ban on off-premise billboards. Moreover, plaintiffs submit, the ordinance is not content neutral because the determination of whether the billboard is considered "on-premise" or "off-premise" depends upon what it says, i.e., does it promote a business or activity at the location of the billboard.

Defendants rely upon *Wheeler v. Commissioner of Highways Commonwealth of Kentucky*, 822 F.2d 586 (6th Cir.1987) for the proposition that the signage ordinance is content neutral because it is the activity for which the site is utilized that defines the contents of any message which may be conveyed by a sign. *Wheeler*, 822 F.2d at 593.

The relevant sections of the ordinance read:

150.430(10) No off-premise sign shall be permitted.

150.420(5) *Sign, Off Premise*—Any sign advertising a business, use, activity, product or merchandise not sold, handled or occurring in the property on which the sign is located.

150.420(6) *Sign, On Premise*—Any sign advertising a business, use, activity, product or merchandise that is sold, handled or occurring in the property on which the sign is located.

In *Metromedia*, the Court held:

"The fact that the city may value commercial messages relating to onsite goods and services more than it values commercial communications relating to offsite goods and services does not justify prohibiting an occupant from displaying its own ideas or those of others." 101 S.Ct. 2882, 2895 (1981).

The signage regulation applies to all property within the city limits of Auburn. Under the ordinance, whether a sign satisfies the ordinance depends upon what it *says*. The speech on the sign must relate to an activity going on at the premises, thus, in some instances precluding speech that is deserving of the greatest protection, e.g., political speech. For instance, under the signage ordinance a homeowner would be precluded from placing a sign in her yard that reads "U.S. Should Pull–Out of U.N.!", because the content would not come under 150.420(6) (assuming the homeowner conducted no United Nations "activities" on-site).[2] Such a sign would also not come under one of the exceptions listed under 150.440.

Thus, the court disagrees with the defendants' interpretation of the content-neutrality of the ordinance. To follow defendants' logic would create the perverse situation that if a person wanted to express views about abortion, gun control, or any other controversial or non-controversial matter,

---

**2.** The court acknowledges that the term "activity" in Section 150.420(6) presents probably the most difficult problem for purposes of definition, i.e., what is and is not allowable on-site signage. The use of the term is almost unavoidably vague. Even a dictionary definition is of little help: *activity*—(1) the quality or state of being active; action; (2) energetic action; liveliness; alertness; (3) a normal function of the body or mind; (4) an active force; (5) any specific action or pursuit [recreational *activities* ] ... *Webster's New World Dictionary,* Third College Edition 14 (1990).

that person would have to make a showing that an "activity" relating to that matter occurs on the premises. Such a restriction has the effect of eliminating speech that is due the highest constitutional protection.

Moreover, Auburn's ordinance, as did San Diego's in *Metromedia*, attempts to invert the Supreme Court's long established rulings according non-commercial speech a greater degree of protection than commercial speech. *See also John Donnelly & Son v. Campbell*, 639 F.2d 6, 15 (1980) ("The law impacts more heavily on ideological than on commercial speech—a peculiar inversion of First Amendment values"). Auburn's signage ordinance is *not* content neutral. It prohibits all kinds of speech because of what it *says*. Again, *Metromedia* is on point.

> The use of onsite billboards to carry commercial messages related to the commercial use of premises is freely permitted, but the use of otherwise identical billboards to carry noncommercial messages is generally prohibited.... Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.

101 S.Ct. at 2895.

■ Likewise, Auburn's ordinance more favorably treats commercial speech than noncommercial speech. Furthermore, the ordinance violates the Constitution's equal protection provision on the grounds that the defendants have not shown how noncommercial billboards would be any more distracting or nonaesthetic than permitted, on-site commercial billboards. *See Metromedia*, 101 S.Ct. at 2895. Thus, the signage ordinance is facially unconstitutional as it violates both the First and Fourteenth Amendments of the U.S. Constitution. Therefore, plaintiff's motion for summary judgment will also be granted on this issue as well.

**3. Are There Sufficient Alternative Channels of Communication?**

■ Plaintiffs further contend that the total ban on off-premise billboards is not a reasonable "time, place, and manner" restriction because it precludes a means of communication for which "alternative channels of communication" do not exist.

Defendants argue that alternative means of communication are available because "the City of Auburn and its residents are within the area of circulation of major newspapers, national periodicals, national and local television and radio." Defendants' *Memorandum in Support of Motion for Summary Judgment*, at 8.

In *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Supreme Court stated the general standard that statutes must satisfy to be a reasonable time, place, and manner restriction:

> [Such restrictions are permissible if] they are justified without reference to the content of the regulated speech, ... serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information.

96 S.Ct. at 1830; *Accord Perry Education Association v. Perry Local Educators*, 460 U.S. 37, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

The court has already found that the ordinance fails to satisfy the first element of this standard, namely, that the restriction impermissible regulates solely by reference to the content of the speech. *See supra*, at 730–732. Regarding the second element, the court has held that the defendants possess a significant governmental interest. *See supra* 726–728. Regarding the third element, the court accepts defendants' contention that Auburn residents have exposure to many local, regional and national means of communication, but this is not the issue. The question is: to what degree do businesses or persons wanting to advertise or promote their goods, services, or causes have reasonable access into these markets?

In reference to a township ordinance that prohibited real estate "For Sale" signs, the U.S. Supreme Court held in *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 1918, 52 L.Ed.2d 155 (1977):

> Although in theory sellers remain free to employ a number of different alternatives, in practice [certain products are] not marketed through leaflets, sound trucks, demonstrations, or the like. The options to which sellers realistically are relegated . . . involved more cost and less autonomy than . . . signs[,] . . are less likely to reach persons not deliberately seeking sales information[,] . . . and may be less effective media for communicating the message that is conveyed by a . . . sign. . . . The alternatives, then, are far from satisfactory.

*Accord Metromedia*, 101 S.Ct. at 2897.

Likewise, in theory Auburn merchants and others have access to several means of communication beyond existing local avenues, such as exposure through regional and national newspaper, radio, and television. However, realistically such options involve substantially "more cost and less autonomy" and would reach a significant number of non-local persons who would likely not have the interest or inclination to receive or act on such information.[3]

Moreover, it is often speech that does not generate revenue in the form of sales, for example, that is deserving of the highest protection. For instance, many messages advocating religious, social, or political views are greatly restricted from dissemination if they must primarily or solely rely upon costly print and electronic means for exposure; the expense and ineffectiveness in using either of these two forms of communication is often prohibitive, and signage remains an important alternative.

Therefore, the ordinance is also unconstitutional because it is not a valid "time, place, and manner" restriction. Plaintiff's summary judgment motion is granted on this issue as well.

### 4. *Plaintiffs' § 1983 Claims*

#### a. General scope of § 1983 actions

Plaintiffs further allege that defendants are liable under 42 U.S.C. § 1983 for violation of plaintiffs' constitutional rights as a result of passage of the signage ordinance. Plaintiffs contend that defendants are liable both in their official capacity and, with the exception of named City Council members, in their individual capacities. The plaintiffs concede that the members of the City Council were involved in the passage of Ordinance 89-1 in their "legislative capacity" and, as such, are probably immune from personal, but not official, liability. *See* Plaintiffs' Brief in Opposition to Defendants' Motion to Summary Judgment, at 27.

Defendants contend that they are not liable under § 1983 because plaintiffs' constitutional rights were not violated by virtue of the ban on off-premise billboards. However, defendants submit that if plaintiffs' constitutional rights are found to have been contravened, defendants are only liable in their official capacity, not individually.

■ To bring a successful § 1983 action, a plaintiff must prove that a defendant has deprived him of a right secured by federal law or the Constitution while acting under color of state law. *See* 42 U.S.C. § 1983. The Supreme Court has defined "under color of state law", for § 1983 purposes, to be as broad as "state action" for purposes of the Fourteenth Amendment. *See Lugar v. Edmondson Oil Co.*, 457 U.S.

3. The court notes the Affidavit of Chris G. Batalis, President of Heptagon, Inc., a marketing firm located in South Bend, Indiana. According to Mr. Batalis, a one-half page advertisement in the Auburn *Evening Sun* is $459 for one day, whereas advertising on a standard size billboard in Auburn is $275 per month. *See Exhibit 9*, Batalis Aff. ¶ 7. Mr. Batalis also states that use of Fort Wayne media is another option available to advertisers in Auburn. However, it is his understanding that Auburn is approximately one percent of the population of Fort Wayne and surrounding areas. Therefore, approximately 99 percent of the individuals receiving the message or advertisement through Fort Wayne media relating to Auburn businesses, events, or concerns would be individuals who do not live in or near the city of Auburn. *Id.*, ¶ 8.

922, 102 S.Ct. 2744, 2753 n. 18, 73 L.Ed.2d 482 (1982). Clearly defendants' passage of the comprehensive zoning ordinance constitutes "state action". The enactment of an ordinance is defined as the enactment of "law" in the State of Indiana. Ind.Code 36–1–2–8 (West Ann.1980). Moreover, plaintiffs have successfully shown that constitutional rights were violated. *See supra* 729–732. Thus, plaintiffs have successfully proven that they are entitled to § 1983 sanctions against defendants. The only question that remains at issue is whether defendants are liable in their official capacities, individual capacities, or both.

b. Defendant City of Auburn is liable under Monell

 Under § 1983 a municipality may be liable for the official acts of its individual defendants. This doctrine was adopted in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which held:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.

98 S.Ct. at 2035–36. *Accord Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Reed v. Village of Shorewood*, 704 F.2d 943, 953 (7th Cir.1983) ("The official acts of municipal policy makers are acts of the municipality for purposes of section 1983 liability").

Thus, a municipality can be held liable under § 1983, and is so held liable for the "official acts" of its officers. *Accord Will v. Michigan*, 491 U.S. 58, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989) (an official-capacity suit against a state officer "is not a suit against the official but rather is a suit against the official's office. As such it is not different from a suit against the State itself".) In enacting the comprehensive zoning ordinance, the Common Council for the City of Auburn was acting as a legislative body. Ind.Code 36–1–4–11 (West Ann.1980). The Plan Commission performed the responsibility of drafting the ordinance; the Common Council of the City of Auburn held public hearings on the proposed new ordinance and approved the Plan Commission's recommendations, and; the Mayor signed the ordinance, thus completing the process necessary to enact the ordinance. All named defendants acted pursuant to their official capacities and, therefore, the municipality (City of Auburn) is liable to plaintiffs under the *Monell* doctrine.

c. Defendants Immune From Liability in Individual Capacity

 While defendants are liable to plaintiffs in their official capacity, the court finds that no issue of material fact exists to hold the individual defendants personally liability. The passage of a comprehensive zoning ordinance was pursuant to the City of Auburn's municipal powers to adopt, codify, and enforce ordinances. Ind.Code 36–1–4–11 (West Ann.1980). During the time of the ordinance's adoption, these municipal powers were being exercised by the named defendants in their official capacities. In reviewing the recommendations of the proposed new ordinance, members of the Auburn City Council were acting in their "legislative capacity", thus, entitling them to absolute immunity. *See Rateree v. Rockett*, 852 F.2d 946, 949–51 (7th Cir.1988) (city commissioners entitled to absolute immunity for acting in their legislative capacities); *accord Reed v. Village of Shorewood*, 704 F.2d at 951–53 (under Illinois law, local liquor control commissioner is acting in judicial capacity and therefore absolutely immune when passing on renewal and revocation questions). Plaintiffs do not dispute that members of the Auburn City Council are entitled to absolute immunity for purposes of *personal* individual liability.

▇ It is the court's opinion that no issue of material fact exists that would deprive the DeKalb County Plan Commission members and Auburn Mayor of also being entitled to absolute immunity. They are so entitled because they were exercising a "legislative function" when they executed their responsibilities to enact the proposed ordinance into local law. What constitutes "legislative capacity" for purposes of immunity is grounded in the "functional" approach.

> This "functional" approach focuses on the nature of the duties with which a particular government official "has been lawfully entrusted, [and evaluates] the affect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."

*Reed v. Village of Shorewood*, 704 F.2d at 950; *see also Dellenbach v. Letsinger*, 889 F.2d 755 (7th Cir.1989).

▇ If the act performed is integral to the traditional legislative function, then the official performing the act is entitled to absolute immunity from § 1983 personal liability. *See* Rotunda, Nowak, Young, *Treatise on Constitutional Law*, § 19.28 (1986) 795. In reviewing the existing zoning ordinance and drafting a new one, the Plan Commission conducted preliminary hearings and made findings which would have been protected as "legislative" if performed by the Auburn City Council. *See* Ind.Code 36–7–4–602 (stipulating duties of advisory plan commission in preparation of zoning ordinance). Moreover, Auburn's Mayor undertook the necessary action to enact the proposed comprehensive ordinance into law when he signed it.

In granting the Plan Commission absolute immunity in regard to passage of the zoning ordinance, the court is not recognizing absolute immunity for *every* act, recommendation, or guidance that Plan Commission members provide to the City Council on request or as directed by statute. The court only finds that Plan Commission members are entitled to absolute immunity when performing essentially or substantially a "legislative function." The court in *Ryan v. Burlington County, NJ*, 889 F.2d 1286, 1290–91 (3rd Cir.1989) states the general parameters of what this function entails.

There are two requirements which an act must meet to be regarded legislative for immunity purposes. First, the act must be "substantively" legislative, i.e., legislative in character. Legislative acts are those which involve policy-making decision[s] of a general scope or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. In addition, the act must be "procedurally" legislative, that is, passed by means of established legislative procedures. This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve.

The drafting of the zoning ordinance was "legislative" in function because the Plan Commission was involved with policy-making that affected the entire citizenship of Auburn in the adoption of local law; their action on the new zoning ordinance did not affect simply one person or a small group of citizens. Moreover, their judgment in making zoning decisions involved discretion ("line-drawing"). Furthermore, although the Auburn Plan Commission itself is not an elected body and its zoning recommendations are non-binding, it was acting on behalf of the City Council when it undertook to examine and recommend a zoning policy. In this capacity, the Plan Commission was a "surrogate" for the City Council and, therefore, should be entitled to the same immunity that the Council itself is entitled to when undertaking "legislative" (policy-making) activities.

As a result, the role and responsibility assumed by the Auburn Plan Commission in examining and recommending a new signage ordinance was "substantially legislative" and, thus, satisfies the first requirement enunciated in *Ryan. See Id.*, at 1291.

Again, such a finding does not support the view that the Plan Commission is entitled to absolute immunity in every function it executes in association with or on the behalf of the City Council. For instance, it is doubtful that such immunity would extend to when the Plan Commission advises the Council regarding individual permit applications or a host of other functions that would be better described as "administrative" rather than "policy oriented" or "legislative".

The actions of the Auburn Plan Commission also satisfy the second requirement in *Ryan*, namely that the Commission's actions were "procedurally" legislative. Before the Plan Commission formally recommended the new zoning ordinance to the City Council, it held forums for public comment and had open discussion about the proposed ordinance. *See* Defendants' Memorandum in Support of Motion for Summary Judgment, at 14.

Auburn's Mayor is similarly entitled to absolute immunity. In signing the ordinance, he was exercising his elected authority necessary to enact the ordinance into local law. Thus, his act of signing the ordinance was not an administrative act but executed as part of the "legislative function" as well. The court agrees with defendants' submission that the entire zoning ordinance process—from the time that the Plan Commission initiated action on creating a new ordinance until the Mayor finally signed the proposed ordinance into law—constituted the legislative function. As such, the individually named defendants are entitled to absolute immunity in their personal capacities for any violation of plaintiffs' constitutional rights under § 1983.

In the alternative, even if the Plan Commission and mayor are not cloaked with absolute immunity, they enjoy qualified immunity from personal liability by virtue of the rationale in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The ruling in *Harlow* held the following:

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.*, 102 S.Ct. at 2738; *accord Hafner v. Melo*, —— U.S. ——; ——, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991) ("... officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.")

In the instant matter, the previous signage ordinance also contained a total ban of off-premise billboards and it had been in place for more than fifteen years. Since the previous ordinance had not been legally challenged, it was reasonable for the defendants to rely upon the previous ordinance as support for their belief that the total prohibition of off-premise billboards was constitutional.

Furthermore, the defendants did express concern about the constitutionality of their actions both generally and with regard to whether the new ordinance could continue the ban on off-premise signs. *See* Exhibit 2, Public Hearing on Zoning Law Changes for the City of Auburn, Jan., 17, 1989, at 46, 94–97, 100–101, 103–108; *see also* Public Hearing, January 24, 1989, at 13–15. At the City Council meeting of January 17, 1989, the City Attorney told members of the City Council that, to his knowledge, the new ordinance continuing the total prohibition would be constitutional. *See* Exhibit 2, Public Hearing on Zoning Law Changes for the City of Auburn, Jan., 17, 1989 (Statement of Hugh Taylor), at 61. At the City Council meeting of January 24, 1989, the City Attorney informed the Council that his research had revealed that it was within the discretion of the Council to ban off-premise billboards. *See* Exhibit 2, Public Hearing on Zoning Law Changes for the City of Auburn, January 24, 1989 (Statement of Hugh Taylor), at 9–10. It was reasonable for members of the City Council to rely upon the advise of their city attorney in helping to understand what they thought to be existing law. As such, de-

fendants are clearly entitled to qualified immunity under the rationale of *Harlow.*

Therefore, the court finds that no issue of material fact exists that would deny the individually named defendants from immunity in their *personal* capacities. However, plaintiffs' summary judgment motion for relief under § 1983 is granted, but only against the named defendants in their official capacity and against defendant City of Auburn in its municipal capacity under the *Monell* doctrine. Defendants' summary judgment motion absolving named individual defendants in their personal capacity is also granted.

5. *Does Ordinance Violate State Constitution and Statutes?*

a. Is Ordinance in Violation of State Law?

██ Plaintiffs finally contend that Auburn's ordinance is in violation of I.C. 8–23–20–1, which governs the regulation of billboards within the state. Plaintiffs argue that defendants' efforts to regulate signage within "adjacent areas" of Interstate 69 exceeds their powers under the statute which, plaintiffs argue, are limited to the designation of commercial or industrial zoned areas.

Defendants argue that they have not violated the Indiana Code, as claimed by Burkhart, because the statute does not create a private cause of action in favor of Burkhart or create a right to the erection of signs.

The Indiana Code provides that the Indiana Highway Department of Transportation and the United States Secretary of Transportation shall enter into an Agreement under 23 U.S.C. to regulate billboards "in areas adjacent to the interstate and primary highway systems". I.C. 8–23–20–1(a). The defendants, having legal authority to zone land, have authority to zone areas for commercial or industrial purposes under the Agreement. *See* I.C. 8–23–20–15 and 23 U.S.C. § 131(d). They further have authority to regulate signage within these areas. However, zoned signage within "zoned or unzoned commercial or industrial areas" as well as within "adjacent areas" must, at a minimum, "conform to the stan-

dards of size, lighting, and spacing" set forth in the Agreement between the Indiana Highway Transportation Department and the U.S. Secretary of Transportation. *See* I.C. 8–23–20–5 and I.C. 8–23–20–4. The federal code gives States and local authorities discretion to establish "standards imposing stricter limitations with respect to signs, displays, and devices on the Federal-aid highway systems." 23 U.S.C. § 131(k).

Relevant definitions under the statute include the following:

8–23–1–9 "Adjacent area" means an area that is adjacent to and within six hundred sixty (660) feet of the nearest edge of the right-of-way of an interstate or primary highway.

8–23–1–43 "Unzoned commercial or industrial area" means:

(2) an adjacent area within a radius of: (B) six (6) miles of a city having a population of less than ten thousand (10,000); that is reasonably appropriate for outdoor advertising, based upon customary use, where no local zoning prohibits advertising.

8–23–1–47 "Zoned commercial or industrial areas" means those areas that are zoned for business, industry, commerce, or trade under a zoning ordinance.

The intent behind the Highway Beautification Act of 1965, 23 U.S.C. § 131 was to adopt "effective controls" to limit outdoor advertising signs in "adjacent areas" and areas visible, outside urban areas, from interstate highways. *See* 23 U.S.C. § 131(c); *see also Scadron v. City of Des Plaines,* 734 F.Supp 1437, 1438–39 (N.D.Ill. 1990). The method of effective controls was to exclude "off-premise" signage in these areas, but an exception was provided for land "zoned industrial or commercial". As the U.S. Seventh Circuit Court held in *National Advertising Company v. City of Rolling Meadows:*

... Under § 131(c), states must prohibit most new off-premises signs near federally-supported highways and must begin to take down old ones. Section 131(d) creates an exception for land "zoned in-

dustrial or commercial", which must be governed by rules to be "determined by agreement between the several States and the Secretary [of Transportation]." 789 F.2d 571, 575 (7th Cir.1986).

The relevant statutory language provides that so long as a local ordinance conforms with the Agreement entered into between the State and the U.S. Secretary of Transportation, then such ordinance "will be accepted in lieu of" the Agreement within the zoned commercial and industrial areas. 23 U.S.C. § 131(d); *see also Indiana State Highway Commission v. Amoco Oil Company*, 406 N.E.2d 1222, 1225 (Ind.App. 1986); Cunningham, *Billboard Control under the Highway Beautification Act of 1965*, 71 Mich.L.R. 1295, 1302 (1973).

Thus, defendants are within their powers to adopt a comprehensive zoning ordinance regulating the size, spacing and lighting of outdoor advertising signs even within adjacent areas (660 feet) of Interstate 69 if, at a minimum, the ordinance conforms with the Agreement.

Moreover, a zoning authority can completely ban billboards within the adjacent area. This court notes, observing the finding in *Amoco Oil Company*, that

> [s]ection 131(k) [of U.S.C. 23] was designed to allow states to impose stricter limitations than those in the federal statute and to make it clear that the federal statute does not give a federal right to maintain advertising signs within the 660 foot strip.[4]

406 N.E.2d at 1225; *see also* Cunningham, *Billboard Control*, 71 Mich.L.R. at 1302.

Thus, the City of Auburn has the statutory discretion to ban billboards altogether within "adjacent areas". This power, of course, cannot be exercised in violation of constitutional restrictions. Thus, if the city does chose to allow some billboards, i.e., on-premise billboards promoting or advertising commercial speech, it cannot then ban all billboards that pertain to noncommercial speech. To find to the contrary would be clearly in violation of the equal

protection doctrine and the decision in *Metromedia*, 101 S.Ct. at 2895 ("Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages").

Therefore, the defendants do have the discretion, under state law, to regulate billboards in adjacent areas of interstate and primary highway systems, even to the point of banning billboards. However, it obviously cannot exercise this discretion in an unconstitutional manner such that it protects commercial speech over noncommercial speech, which is clearly what the Auburn signage ordinance does. Plaintiff's motion for summary judgment is granted on this issue.

### b. Is Ordinance in Violation of Indiana Constitution?

 Plaintiffs finally contend that the defendants have violated Sections 9 and 23 of Article I of the Indiana Constitution. These sections are similar to the First and Fourteenth amendments to the United States Constitution. Section 23 of Article I reads:

> Privileges equal.—The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.

Defendants admit that Sections 9 and 23 are comparable to the First and Fourteenth Amendments to the U.S. Constitution. However, they also submit that state rights under these provisions are no more expansive than their comparable Federal rights. Since it is defendants contention that plaintiffs have no valid cause of action under their federal claims, defendants argue that plaintiffs, therefore, have no valid claims under their state claims.

However, it has already been established that the signage ordinance is in violation of valid speech restrictions and equal treatment protections arising under the First and Fourteenth Amendments. *See supra*,

---

**4.** Section 131(k) states in relevant part: "... nothing in this section shall prohibit a State from establishing standards imposing stricter limitations with respect to signs, displays, and devises on the Federal-aid highway systems than those established under this section."

at 729–732. Therefore, for the very same reasons, the ordinance is in violation of Section 9 and Section 23 of Article I of the Indiana Constitution. Plaintiff's summary judgment motion is also granted on this issue.

## CONCLUSION .

Plaintiffs' motion for summary judgment is hereby GRANTED EXCEPT with regard to their § 1983 claims of *individual* liability against named defendants. Plaintiffs are hereby GRANTED the relief they seek, including declaratory judgment that Ordinance 89–1 is unconstitutional, their reasonable attorney fees and all reasonable costs associated with this action, a statement of which is to be provided by plaintiffs to the court within 20 days. Defendants' motion for summary judgment is hereby DENIED EXCEPT that partial summary judgment is GRANTED absolving all named defendants of individual liability under 42 U.S.C. § 1983.