(No. 72848.—

ROBERT SCADRON *et al.*, Appellants, v. THE CITY OF DES PLAINES, Appellee.

*Opinion filed November 19, 1992.*

Springer, Casey, Dienstag & Devitt, P.C., of Chicago (Gary E. Dienstag and Edward M. Springer, of counsel), for appellants.

Mathias W. Delort and Burton S. Odelson, of Odelson & Sterk, Ltd., of Evergreen Park, for appellee.

Gordon & Glickson, P.C., of Chicago (Sanford M. Stein and Sarah K. Nadelhoffer, of counsel), for *amicus curiae* National Advertising Co.

Robert J. Weber, of Chicago, for *amicus curiae* Outdoor Advertising Association of Illinois.

Siegel, Moses, Schoenstadt & Webster, of Chicago (Morton Siegel, Michael A. Moses and James L. Webster, of counsel), for *amicus curiae* Miller Brewing Co.

Barbara J. Gosselar and Kenneth T. Kubiesa, of Kubiesa & Power, Ltd., of Westmont, for *amicus curiae* Village of Downers Grove.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon and Jean Dobrer, of counsel), for *amicus curiae* City of Chicago.

168

Beth Anne Janicki, of Springfield, for *amicus curiae* Illinois Municipal League.

JUSTICE MORAN delivered the opinion of the court:

This court has agreed to answer the following three questions of State law which were certified by the United States Court of Appeals for the Seventh Circuit:

"1. Does the Illinois Highway Advertising Control Act of 1971 (Ill. Rev. Stat. 1987, ch. 121, par. 501 *et seq.*) (the Act), preempt the authority of home rule municipalities to regulate outdoor advertising signs in areas subject to the Act?

2. If the Act does preempt home rule autonomy, does section 7 of the Act authorize home rule units to regulate outdoor advertising within 660 feet of federally-funded highways more restrictively than the criteria set forth in section 6?

3. If home rule units may regulate such outdoor advertising, does section 7 of the Act authorize such local municipalities to totally exclude outdoor advertising signs in areas subject to the Act?"

The district court accepted the facts alleged in the complaint as true when it rendered its memorandum opinion and order. (734 F. Supp. 1437.) For purposes of this appeal, we will also accept as true all well-pleaded facts alleged in the underlying complaint.

Plaintiffs, Robert Scadron, Jeffrey Scadron, and Barry Scadron, doing business as Scadron Enterprises (Scadron), are engaged in the business of leasing real property for the purpose of erecting advertising sign structures. Scadron then leases or donates the faces of the signs atop the structures to various advertisers for the display of commercial and noncommercial messages.

Scadron entered into a lease agreement wherein it agreed to lease a section of property at 2410 Des Plaines Avenue, Des Plaines, Illinois. The property, which is

zoned for business and commercial uses, abuts an entrance ramp to I-294, also known as the Tri-State Tollway (hereinafter referred to as the tollway). Scadron applied for a building permit from the defendant, the City of Des Plaines (the City), because it wanted to erect an advertising sign structure on the property. The planned structure would be built within 660 feet of the tollway and it was going to support a dual-face billboard, with both sign faces measuring 20 feet by 60 feet. Thus, each sign face would have 1,200 square feet of display area. Scadron intended to make the billboard available for off-premise advertising of commercial and noncommercial messages. An off-premise sign is generally known as a sign which directs attention to an activity which is not conducted on the premises where the sign is located. See, *e.g.*, *National Advertising Co. v. City of Rolling Meadows* (7th Cir. 1986), 789 F.2d 571, 573.

Scadron obtained a permit for the construction of the sign from the State agency charged with enforcing the Act—the Illinois Department of Transportation (the Department). However, the City denied Scadron a permit. The City's sign regulations provided that no sign structure could be erected if the billboard is designed so that it would be viewed from a limited access highway, such as the tollway.

Scadron filed a three-count complaint in the United States District Court for the Northern District of Illinois, Eastern Division. (Because of the nature of the questions presented, this court will address only count III of Scadron's complaint.) In count III, Scadron alleged that the Act preempted the City's sign ordinance, thereby making the City's sign ordinance void. The City filed a motion to dismiss in which it maintained that Scadron's complaint failed to state a cause of action. After responsive memoranda were filed, the district court dismissed count III of Scadron's complaint because it be-

lieved that this court would find that the City's sign ordinance is not preempted by the Act. 734 F. Supp. at 1455.

Thereafter, Scadron appealed the matter to the United States Court of Appeals for the Seventh Circuit. On appeal, the Seventh Circuit court requested that we consider answering three questions because it opined that answers to those questions could be dispositive of the cause. We agreed to answer the certified questions pursuant to Rule 20 (134 Ill. 2d R. 20), and we also allowed a number of organizations to submit briefs as *amici curiae* (134 Ill. 2d R. 345).

According to the first question, the pivotal question of the three presented, this court is asked to determine whether the legislature intended to preempt the authority of home rule municipalities to regulate outdoor advertising in areas subject to the Act. The relevant background information pertaining to the Act is as follows. The Act went into effect in this State on July 1, 1972, in response to Congress' enactment of the Highway Beautification Act of 1965 (23 U.S.C. §131 *et seq.* (1970) (the Beautification Act)). (*National Advertising Co. v. Village of Downers Grove* (1988), 166 Ill. App. 3d 58, 60.) According to the Beautification Act, Congress has expressly declared that outdoor advertising signs which border the interstate highway system should be controlled to, *inter alia*, promote safe travel and preserve natural beauty (23 U.S.C. §131(a) (1970)). If a State does not provide for the effective control of advertising signs located within 660 feet of interstate highways, then the Secretary of Transportation would reduce by 10% the Federal highway funds normally payable to that State (23 U.S.C. §131(b) (1970)). Consequently, the Act was passed and it provides for the control of outdoor advertising signs located within 660 feet of interstate highways.

The pertinent provisions of the Act are as follows. The first paragraph of section 1 provides:

"The General Assembly finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to Interstate highways and primary highways *should be regulated* in order to protect the public investment in such highways, to promote the recreational value of public travel, to preserve natural beauty and to promote the reasonable, orderly and effective display of such signs, displays and devices." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 121, par. 501.)

The above language closely parallels the language of section 131(a) of the Beautification Act:

"The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system *should be controlled* in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." (Emphasis added.) 23 U.S.C. §131(a) (1970).

A key difference though, between the Act and its Federal counterpart, is that the General Assembly has made an additional finding in the second paragraph of section 1:

"The General Assembly further finds and declares that outdoor advertising is a legitimate, commercial use of private property adjacent to roads and highways; that outdoor advertising is an integral part of the business and marketing function, and an established segment of the national economy which serves to promote and protect private investments in commerce and industry and *should be allowed to operate in business areas; and that the regulatory standards set forth in Section 6 of this Act are consistent with customary use in this State and will properly and adequately carry out each and all of the purposes of this Act, more severe restrictions being inconsistent with customary use and ineffective to accomplish the*

*purposes of this Act."* (Emphasis added.) Ill. Rev. Stat. 1987, ch. 121, par. 501.

Section 6 of the Act places size, lighting and spacing limitations on outdoor signs, and the limiting provisions provide, in part, as follows:

> "Size. No sign may be erected which exceeds 1,200 square feet in area, 30 feet in height and 60 feet in length, including border and trim, but excluding ornamental base or apron, supports and other structural members." (Ill. Rev. Stat. 1987, ch. 121, par. 506.01.)

> "Lighting. (a) No sign may be erected which contains, includes or is illuminated by any flashing, intermittent or moving light or lights, except those giving public service information \*\*\*." (Ill. Rev. Stat. 1987, ch. 121, par. 506.02(a).)

> "Spacing. (a) No sign may be erected or maintained in such a manner as to obscure or otherwise physically interfere with an official traffic sign \*\*\*.

> (b) Along interstate highways and expressways no two sign structures on the same side of the highway shall be erected less than 500 feet apart." Ill. Rev. Stat. 1987, ch. 121, pars. 506.03(a), (b).

Concomitant with the above regulations, the legislature importantly has provided that municipal zoning authorities may also regulate the size, lighting and spacing of signs:

> "In zoned commercial and industrial areas, whenever a State, county or municipal zoning authority has adopted laws or ordinances, which include regulations with respect to the size, lighting and spacing of signs, *which regulations are consistent with the intent of this Act and with customary use*, then from and after the effective date of such regulations, and so long as they shall continue in effect, the provisions of Section 6 shall not apply to the erection of signs in such areas." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 121, par. 507.

Lastly, the legislature has given the Department the power to establish regulations to be used in enforcing the Act:

"The Department may establish rules and regulations regarding implementation and enforcement of this Act, which regulations are not inconsistent with the terms of this Act; provided however, that the Department may not add to, or increase the severity of the regulatory standards set forth in Section 6 of the Act, as now or hereafter amended." Ill. Rev. Stat. 1987, ch. 121, par. 514.01.

The City, through an ordinance known as the "Sign Regulations," has provided that it is unlawful for someone to erect a sign without first obtaining a permit from the City's building inspector. The sign regulations further provide that no single sign could exceed 480 square feet in area, assuming, *inter alia*, that the lot is larger than five acres. (See 734 F. Supp. at 1441 n.7 ("The size limitations established in [the City's regulations] are complex, and they vary in accordance with the size of the lot on which they are placed. The size limits may be as small as 120 square feet in area and 20 feet in height. The largest size limits are 480 square feet in area and 35 feet in height").) The sign regulations explain that the regulatory standards were established in light of the following findings: signs are distracting to motorists and off-premise commercial advertising obscures the efforts of local businesses to identify the nature of their business activity. The standards were established with the following purposes in mind: reduce the danger to motorists; enhance the appearance of the landscape; preserve the beauty of the landscape; and promote the public health, safety and welfare of the City. Notably absent from the City's findings is any declaration similar to the second paragraph of section 1 of the Act, in which the General Assembly declared that outdoor advertising is a legitimate commercial activity which should be permitted

to operate in business areas (Ill. Rev. Stat. 1987, ch. 121, par. 501).

Moreover, sections 10.5.5 and 10.5.5.1 of the City's zoning ordinance provide:

> "*LOCATION OF ADVERTISING DEVICES*: No advertising device shall be erected, constructed, relocated or maintained:
>
>> If such advertising device is designed to have or has the advertising thereon maintained primarily to be viewed from a limited access highway."

Before we can determine whether the Act preempts the authority of a home rule unit to regulate outdoor advertising signs, this court must initially consider whether a home rule unit has the power to regulate such signs. Municipal corporations are created by law. (2 E. McQuillin, The Law of Municipal Corporations §10.09 (3d rev. ed. 1988).) Thus, in the case of a non-home-rule unit, it has only those powers expressly granted by law, powers incidental to those provided by law, and powers which are considered indispensable to the accomplishment of the purposes of the municipal corporation. (*Pesticide Public Policy Foundation v. Village of Wauconda* (1987), 117 Ill. 2d 107, 112.) By contrast, the powers of a home rule municipality (*i.e.*, those municipalities with a population greater than 25,000 (Ill. Const. 1970, art. VII, §6(a))) are derived from article VII, section 6(a), of the Illinois Constitution of 1970, which provides, in relevant part:

> "[A] home rule unit may exercise any power and perform any function *pertaining to its government and affairs* including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." (Emphasis added.) (Ill. Const. 1970, art. VII, §6(a).)

The above constitutional provision was written with the intention that home rule units be given the broadest powers possible. (Ill. Ann. Stat., 1970 Const., art. VII,

§6, Constitutional Commentary, at 24 (Smith-Hurd 1971).) In addition, the Constitution also provides that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, §6(m).

Scadron argues that the regulation of outdoor advertising does not pertain to the City's government and affairs because such regulations are of national and state-wide concern. The City maintains that sign regulations are a form of land use planning which promotes traffic safety and aesthetics, and thus, such regulation clearly pertains to its government and affairs.

The constitutional convention seemed to recognize that the "government and affairs" language of section 6(a) would be problematic, and that it would often require judicial interpretation. (Ill. Ann. Stat., 1970 Const., art. VII, §6, Constitutional Commentary, at 23 (Smith-Hurd 1971).) Scadron relies on *Ampersand, Inc. v. Finley* (1975), 61 Ill. 2d 537, 540, where this court quoted the local government committee's explanation " 'that the powers of home rule units relate to their own problems, not to those of the state or the nation.' " Quoting 7 Record of Proceedings, Sixth Illinois Constitutional Convention 1621.

Simply because the proliferation of billboards may be a national and State problem, it does not then immediately follow that the problems posed by billboard advertising are of no concern to home rule municipalities. " '[H]ome rule units are supposed to be free to carry on activities that relate to their communities even if the state also is interested and is active in the area.' " (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494, 510-11, quoting Baum, *A Tentative Survey of Illinois Home Rule (Part 1): Powers and Limitations*, 1972 U. Ill. L.F. 137, 155.) Professor Baum, counsel to the convention's Committee on Local Government, explained that the government and affairs language of sec-

tion 6 "does not contemplate substantial restraint added by judicial interpretation; indeed, it was designed to make this interpretation difficult if not impossible. A judicial preemption doctrine based upon the existence of legislative regulation was specifically frowned upon." 1972 U. Ill. L.F. at 156.

This court recognized that "[t]he difficulty in determining the extent of home rule power arises because many matters are of both local and regional or statewide concern. *** [The judiciary has] to decide which *** matters are sufficiently local in character so as to be subject to the home rule power." (*John Sexton Contractors Co.*, 75 Ill. 2d at 508-09.) "Home rule *** is predicated on the assumption that problems in which local governments have a legitimate and substantial interest should be open to local solution and reasonable experimentation to meet local needs, free from veto by voters and elected representatives of other parts of the State who might disagree with the particular approach advanced by the representatives of the locality involved or fail to appreciate the local perception of the problem." (*Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 502.) Whether a problem is of statewide or local dimension must be determined "with regard for the nature and extent of the problem, the units of government which have the most vital interest in its solution, and the role traditionally played by local and statewide authorities in dealing with it." *Kalodimos*, 103 Ill. 2d at 501.

Municipalities have traditionally played an important role in regulating outdoor advertising signs. Outdoor advertising as a commercial endeavor dates back to the 1880s. (Cunningham, *Billboard Control Under the Highway Beautification Act of 1965*, 71 Mich. L. Rev. 1295, 1346 (1973).) "From the 1890's onward *** large-scale commercial promotion of billboard advertising became so

aggressive and its methods so crude as to provoke prohibitory legislation, usually in the form of municipal ordinances." (71 Mich. L. Rev. at 1346-47.) Cases upholding municipal billboard regulations on safety and amenity grounds can be found as far back as the early 1900s. 71 Mich. L. Rev. at 1347.

In *City of Chicago v. Gunning System* (1905), 214 Ill. 628, an advertising company alleged that Chicago's billboard ordinance of 1900 was invalid because, *inter alia*, it maintained that the city did not have the authority to regulate billboards. The court disagreed, finding that subsections 66 and 75 of section 1, article V, of the cities and villages act (Ill. Rev. Stat. 1899, ch. 24, par. 62) empowered cities, towns and villages to regulate billboards within their corporate limits. *Gunning System*, 214 Ill. at 639.

In another lawsuit involving the City of Chicago, *Thomas Cusack Co. v. City of Chicago* (1914), 267 Ill. 344, an advertising company sought to restrain the enforcement of Chicago's billboard ordinance contending, *inter alia*, that the city did not possess the power to promulgate billboard ordinances. The court rejected the company's argument. First, the court referred to the *Gunning System* decision in which it had earlier held that the cities and villages act gave municipalities the power to regulate billboards within their corporate limits. (*Thomas Cusack Co.*, 267 Ill. at 347-48.) Secondly, it noted that the legislature in 1912 passed a law (see Ill. Rev. Stat. 1913, ch. 24, par. 696), which unmistakably demonstrated that billboards were subject to municipal regulation. (*Thomas Cusack Co.*, 267 Ill. at 348-49.) Even today, laws of this State demonstrate that outdoor advertising signs are subject to municipal regulation. (See Ill. Rev. Stat. 1991, ch. 24, par. 11—80—15; Ill. Rev. Stat. 1991, ch. 121, par. 507.) Based on the foregoing, we find that municipalities have traditionally regu-

lated outdoor advertising signs through the enforcement of local ordinances.

Given the potential problems that may arise with the erection of outdoor advertising signs, municipalities have a substantial interest in the kinds of structures that are erected and where those structures are intended to be placed. To find the local interest in the regulation of outdoor advertising signs, we need look no further than the sign regulations themselves, in which the sign standards were set with the following findings in mind: a multiplicity of signs is distracting and hazardous to motorists; the proliferation of off-premise commercial signs thwarts the efforts of local businesses to identify their products or services; and regulation would enhance the appearance and preserve the beauty of the landscape. Therefore, we hold that the City has the power to regulate outdoor advertising because it pertains to its government and affairs.

Having concluded that the City has the power to regulate outdoor advertising, we must next determine whether the legislature has specifically limited the power of a home rule unit to regulate such advertising or if it has specifically declared the State's power over signs to be exclusive. The 1970 Constitution provides:

> "Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive." Ill. Const. 1970, art. VII, §6(i).

Over the course of many years, different courts have reached conflicting results on the preemption question which the Seventh Circuit now asks us to answer. (*Dolson Outdoor Advertising Co. v. City of Macomb* (3d Dist. 1977), 46 Ill. App. 3d 116; *Ridge Outdoor Advertising Co. v. Village of Indian Head Park* (1st Dist. 1984),

129 Ill. App. 3d 525; *Dingeman Advertising, Inc. v. Village of Mt. Zion* (4th Dist. 1987), 157 Ill. App. 3d 461; *National Advertising Co. v. Village of Downers Grove* (2d Dist. 1988), 166 Ill. App. 3d 58; *Universal Outdoor, Inc. v. Village of Elk Grove* (1st Dist. 1990), 194 Ill. App. 3d 303; *Whiteco Metrocom Division v. Village of Downers Grove* (2d Dist. 1990), 197 Ill. App. 3d 174; *City of Rolling Meadows*, 789 F.2d 571.) A careful review of these decisions will highlight the confusion among the courts on the question of whether the State has preempted a municipality's authority to regulate signs in areas subject to the Act.

In the first reported decision, *Dolson Outdoor Advertising Co.*, 46 Ill. App. 3d 116, a non-home-rule municipality denied an advertising company a permit to erect a sign because the city's ordinance prohibited off-premise advertising in business and industrial districts. The third district of the appellate court found the ordinance invalid because it reasoned that off-premise advertising is specifically authorized by the Act, and that the General Assembly did not give the city the authority to regulate advertising signs more restrictively than the State does under the Act. *Dolson Outdoor Advertising Co.*, 46 Ill. App. 3d at 121.

In *Ridge Outdoor Advertising Co.*, 129 Ill. App. 3d 525, a non-home-rule municipality sought to prevent a sign company from erecting a sign near the tollway because the proposed sign did not conform with its ordinance. The village maintained that the ordinance should be interpreted such that the height of the sign should be measured from the road running beneath the tollway. Conversely, the sign company contended that, in determining whether the proposed sign is within the village's height limitation, the sign should be measured from the tollway. The first district of the appellate court concluded that the sign must be measured from the tollway.

The court reasoned that if it accepted the village's interpretation, only a portion of the sign would be observable from the tollway, and it was bound to construe the ordinance so as "to avoid more severe restrictions inconsistent with regulations set forth in the Act (Ill. Rev. Stat. 1983, ch. 121, par. 501)." *Ridge Outdoor Advertising Co.*, 129 Ill. App. 3d at 529.

The next reported decision, *City of Rolling Meadows*, 789 F.2d 571, addressed the issue of whether the City of Rolling Meadows, a home rule municipality, had the authority to ban off-premise signs and to impose more restrictive size limitations than the limitations provided for in the Act. The United States Court of Appeals for the Seventh Circuit stated that Rolling Meadows, as a home rule municipality, could exercise its powers concurrently with the State, but it could not exercise its powers in a way which would alter a State scheme that established uniform law throughout the State. (*City of Rolling Meadows*, 789 F.2d at 576.) The court reasoned that Rolling Meadows did not have the power to ban off-premise signs:

"The 1971 Act calls for uniformity on the subjects mentioned in §6, which implies that home-rule jurisdictions have no powers (beyond those granted by §7) to regulate signs. At least one state court has held this, reasoning that because §1 establishes uniform standards throughout Illinois, home-rule municipalities lack authority to ban off-premises signs. *Dolson Outdoor Advertising Co. v. Village of Rantoul*, No. 77–C–721 (Cir. Ct., 6th Jud. Cir., Champaign County, May 18, 1978), slip op. 8. Were it otherwise, the many home-rule municipalities in Illinois would prevent the state as a whole from carrying out the 1971 Act, which Illinois must to receive federal highway funds." *City of Rolling Meadows*, 789 F.2d at 576.

The court also invalidated Rolling Meadows' size limitations (a sign could not exceed 200 square feet in area and no sign could exceed 20 feet in height above curb

level), finding the size limits on signs to be more restrictive than section 6 and, thus, inconsistent with "customary use." The court read *Ridge Outdoor Advertising Co.*, 129 Ill. App. 3d 525, to mean "that a locality may restrict the *total* height of a sign and its support structures, but it may not restrict the size of the visible face of the sign to less than 1,200 square feet." (Emphasis in original.) *City of Rolling Meadows*, 789 F.2d at 577.

However, with the fourth district of the appellate court's decision in *Dingeman Advertising, Inc.*, 157 Ill. App. 3d 461, the tide turned against the billboard companies. In *Dingeman*, the Village of Mt. Zion would not issue a permit to an advertising company so that it could erect a sign, because the proposed sign was too big—the village ordinance prohibited all signs larger than 150 square feet in area. Dingeman contended that the sign ordinance was invalid because it conflicted with the Act. The appellate court concluded that the village ordinance was valid, even though the village's size limitation was more severe than the limitation provided for in the Act. The court reasoned that a conflict existed within the Act:

> "While funds from the Federal government were the basic reason for the Act, as is often the case, conflicting interests, those of the advertising sign industry and those of the various municipalities, influenced different provisions of the legislation. The result was conflicting provisions. Section 6 of the Act sets forth the maximum limitations which were necessary to avoid the loss of Federal highway funds. Section 7 of the Act would allow municipal zoning regulation of signs as long as such are 'consistent with the intent of this Act and with customary use.' ***

> Without the second paragraph of section 1 of the Act, it would be clear that municipalities could provide restrictions on size as long as they are within the maximum and not inconsistent with 'customary use.' If 'cus-

tomary use' is, in fact, the upper limits provided by section 6, then section 7 is a nullity, as is the provision in section 4.04 referring to section 7. In fact, the use of the term 'customary use' in the legislation would be a nullity. A conflict definitely exists within the Act. If 'customary use' must be construed to be the maximum limitations provided by section 6, then municipalities have no authority as to size, lighting, and spacing. If 'customary use' is not so limited, the municipalities may have effective zoning control over size, lighting, and spacing." *Dingeman Advertising, Inc.*, 157 Ill. App. 3d at 463.

The court concluded:

"If signs in municipal areas could only be limited to the maximum limitation of the Act, the purpose of the Act 'to preserve natural beauty and to promote the reasonable, orderly and effective display of such signs, displays and devices' would be frustrated. We hold that, insofar as section 1 and section 7 conflict, section 7 controls and uphold Mt. Zion's right to regulate the size, lighting, and spacing of advertising signs consistent with customary use." *Dingeman Advertising, Inc.*, 157 Ill. App. 3d at 465.

In the next reported decision, the second district of the appellate court in *National Advertising Co. v. Village of Downers Grove*, 166 Ill. App. 3d 58, agreed with the reasoning and conclusion in *Dingeman*. The court held that the Village of Downers Grove, a home rule unit, could impose more stringent size and location limitations than the sign limitations contained in the Act.

Afterward, the first district of the appellate court in *Universal Outdoor, Inc.*, 194 Ill. App. 3d 303, also addressed the issue of whether a home rule unit has the authority to regulate outdoor advertising signs more restrictively than the State does under the Act. The court found that the Act did not preempt the village's more restrictive sign ordinance. The court's reasoning was as follows:

" 'A statute intended to limit or deny home rule powers must contain an express statement to that effect.' [Citation.] We find no express statement contained within the Act that home rule municipalities may not enact more restrictive regulations pertaining to advertising signs. Rather, we agree with the trial court in finding that section 1 of the Act (Ill. Rev. Stat. 1987, ch. 121, par. 501), which contains the limiting language upon which plaintiff relies, is more, in effect, a preamble to the extent it conflicts with section 7 of the Act (Ill. Rev. Stat. 1987, ch. 121, par. 507). We, therefore, find *** that the Act did not preempt defendant's more restrictive sign regulatory ordinance." *Universal Outdoor, Inc.*, 194 Ill. App. 3d at 308.

In yet another lawsuit involving the Village of Downers Grove, *Whiteco Metrocom Division*, 197 Ill. App. 3d 174, a sign company proposed to erect two double-faced signs, with each of the sign faces having a total display area of 1,200 square feet. Although the Department gave the sign company permits for the signs, the Village of Downers Grove, a home rule municipality, advised Whiteco that its ordinance does not permit signs with faces that exceed 200 square feet in area. The court found that Downers Grove's ordinance was valid even though its size limits were more severe than the limits set forth in the Act. The court reasoned as follows:

"The regulatory standard for sign size established by section 6 of the Act which, by virtue of section 1, is expressly declared to be consistent with customary use in this State, is a *maximum* of 1,200 square feet in area. Section 6 clearly permits the erection of signs *less than* 1,200 square feet in area. Consequently, if signs *not exceeding* 1,200 square feet in area *are consistent* with customary use as declared in section 1, then the only sign size regulation which would be *inconsistent* with customary use would be one that allows erection of a sign with an area of *more than* 1,200 square feet.

The only way to achieve consistency between the apparent blanket prohibition of section 1 against 'more severe restrictions' and the preemptive capabilities granted zoning authorities in section 7 is to construe section 1 as a declaration that 'more severe restrictions [on a statewide basis would be] inconsistent with customary use and ineffective to accomplish the purposes of this Act.' Construed thusly, the statute assures that outdoor advertising signs in business areas adjacent to interstate highways and primary highways in the State of Illinois shall be allowed and *may be* as large in area as 1,200 square feet *except* insofar as they may be located in zoned business and industrial areas and are otherwise regulated *not in excess of the maximum size limitation of 1,200 square feet.*" (Emphasis in original.) *Whiteco Metrocom Division,* 197 Ill. App. 3d at 182.

Lastly, the United States District Court for the Northern District of Illinois, Eastern Division, issued an opinion on the exact preemption question raised here. (734 F. Supp. 1437.) After examining the reported decisions in detail, the court found the analysis of the Act in *Dingeman* to be persuasive. The court reviewed the language of the Act and explained:

"It would be meaningless to state that a municipality may regulate, for example, the spacing of signs, but may not require greater spacing than [the Act] requires. (Of course, it would be equally meaningless to state that municipalities may enact more lenient spacing requirements, for the spacing requirements of [the Act] would still control.) Thus to hold, as the earlier cases did, that a municipality cannot enact regulations more stringent than those in section 6 is to nullify these provisions in section 7.

&ast;&ast;&ast;

The Court agrees with the *Dingeman* court that the inconsistencies within [the Act] are unavoidable. The Court further agrees that the provision which must give way is the phrase in section 1 that more stringent regulations are inconsistent with customary use. As explained in *Dingeman,* this method of resolving [the Act's] incon-

sistencies does the least damage to [the Act's] purposes and to its overall scheme. Additionally, section 1, as a statement of findings which introduces the remainder of the statute, should be given less weight than the subsequent text of the operative body of the statute." 734 F. Supp. at 1454.

Therefore, the court found that the City's sign regulations were not preempted by the Act. Additionally, the court found it unnecessary to decide the validity of the City's ban on signs along limited access highways because the size of Scadron's sign would exceed the size restriction contained in the City's sign regulations.

Rather than meander through the intricacies of the many principles of statutory construction, this court finds that it is necessary to look to just a few principles to decide the preemption question put to us by the United States Court of Appeals for the Seventh Circuit. "[T]he primary rule, to which all other rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature." (*Kraft, Inc. v. Edgar* (1990), 138 Ill. 2d 178, 189.) The language of a statute must be reviewed as a whole, such that each section of a statute is examined in relation to every other section. Another basic principle of statutory construction is that courts should start with the language of the statute itself, and give the language used its plain and commonly understood meaning, unless the intention of the legislature is to the contrary. *In re Petition to Annex Certain Territory to the Village of North Barrington* (1991), 144 Ill. 2d 353, 362.

We have confined ourselves to the aforementioned rules because the 1970 Illinois Constitution states that a municipality's home rule powers are preempted by the State under very narrow circumstances:

"Home rule units may exercise and perform concurrently with the State any power or function of a home

rule unit to the extent that the General Assembly by law does not *specifically* limit the concurrent exercise or *specifically* declare the State's exercise to be exclusive." (Emphasis added.) (Ill. Const. 1970, art. VII, §6(i).)

The purpose of section 6(i) "is to eliminate or at least reduce to a bare minimum the circumstances under which local home rule powers are preempted by judicial interpretation of unexpressed legislative intention." Baum, *A Tentative Survey of Illinois Home Rule (Part II): Legislative Control, Transition Problems, and Intergovernmental Conflict*, 1972 U. Ill. L.F. 559, 571.

It cannot seriously be argued that the General Assembly specifically has declared that the State has the exclusive power to regulate signs within 660 feet of interstate highways, because section 7 of the Act gives municipalities the authority to regulate such signs, "includ[ing] regulations with respect to the size, lighting and spacing of signs." (Ill. Rev. Stat. 1987, ch. 121, par. 507.) If the legislature intends to exclude local action, it must do so in a specific manner. "If it does not, then section 6(i) makes clear that the home rule units may exercise any nonexclusive power concurrently with the state," provided such power has not been specifically limited. 1972 U. Ill. L.F. at 568.

Therefore, this court must read the Act to see whether the General Assembly has *specifically limited* the power of home rule units to concurrently regulate outdoor advertising signs along with the State. See *Kalodimos*, 103 Ill. 2d at 503 (the mandate of section 6(i) of the Illinois Constitution of 1970 is "that home rule units may exercise home rule powers concurrently with the State until the General Assembly 'specifically' limits such exercise").

Scadron argues that section 7 of the Act expressly limits a municipality's regulatory power because any local regulation has to be "consistent with the intent of

th[e] Act and with customary use" (Ill. Rev. Stat. 1987, ch. 121, par. 507); and, according to the second paragraph of section 1, "more severe restrictions [than those in section 6 are] inconsistent with customary use and ineffective to accomplish the purposes of this Act." (Ill. Rev. Stat. 1987, ch. 121, par. 501.) The City maintains that its home rule powers have not been specifically limited by the General Assembly, because there is no specific statement within the Act indicating that a home rule unit's power is preempted; in fact, the City notes that the words "home rule" do not appear anywhere in the Act.

In *Rozner v. Korshak* (1973), 55 Ill. 2d 430, the court made the following comment on the ability of the General Assembly to limit or deny a power of a home rule unit under section 6(g) of article VII of the Illinois Constitution:

> "While section 6(g) of article VII authorizes the General Assembly, by a law approved by three fifths of the members of each house, to deny or limit the power of a home-rule unit, it does not follow that every statute relating to the powers of municipalities generally will, if adopted by a three-fifths vote, have a bearing upon the powers of those municipalities which are home-rule units. *** The kind of inadvertent restriction of the authority of home-rule units for which the plaintiff contends can be avoided if statutes that are intended to limit or deny home-rule powers contain an express statement to that effect." *Rozner*, 55 Ill. 2d at 435.

We find the comments of the *Rozner* court on section 6(g) to be similarly applicable to section 6(i). As the court stated in *Stryker v. Village of Oak Park* (1976), 62 Ill. 2d 523, 528, citing *Rozner*, 55 Ill. 2d 430, "[a] statute intended to limit or deny home rule powers must contain an express statement to that effect." Under section 6(i), the General Assembly can restrict the concurrent exercise of a home rule unit's power by enacting a law which

specifically limits such power. But, unless a State law *specifically* states that a home rule unit's power is limited, then the authority of a home rule unit to act concurrently with the State cannot be considered restricted. This interpretation supports the home rule provisions of our constitution "which favor concurrent exercise of power by the state and by home rule units and attempt to avoid implied 'preemption' by judicial decisions. The Illinois approach places almost exclusive reliance on the legislature rather than the courts to keep home rule units in line." 1972 U. Ill. L.F. at 579.

After carefully reviewing the entire Act, we find that the legislature did not specifically express its intention that a home rule unit's concurrent power to regulate signs is limited. As the first district of the appellate court correctly noted in *Universal Outdoor, Inc.*, 194 Ill. App. 3d at 308, there is "no express statement contained within the Act that home rule municipalities may not enact more restrictive regulations pertaining to advertising signs." While section 7 refers to municipal zoning authorities, it does not *specifically* refer to home rule municipalities as it must under our constitution if a power of a home rule unit is to be limited. If the language of the Act was as specific as Scadron suggests, one would have expected less confusion on the subject in the courts. (See 734 F. Supp. at 1449 ("Inartful drafting of [the Act] has led to an ongoing dispute over the extent to which it preempts local regulation of advertising signs"); *Universal Outdoor, Inc.*, 194 Ill. App. 3d at 306 ("Section 7 and section 1 of the Act are incongruous"); *Dingeman Advertising, Inc.*, 157 Ill. App. 3d at 464 ("sections of the [Act] are in conflict").) The legislature is perfectly capable of being specific when it wants to be. However, it has not been specific in this instance. Thus, we find that the Act does not preempt the authority of

home rule municipalities to regulate outdoor advertising signs in areas subject to the Act.

In light of our answer to the first question, question number two cannot be answered because it is conditioned on us finding that the Act preempts home rule autonomy. Thus, we turn our attention to the third and final question, in which we are asked to determine whether section 7 authorizes local municipalities to totally exclude outdoor advertising signs in areas subject to the Act.

Scadron contends that the City cannot ban signs along the tollway because the State has established a coordinated plan to regulate outdoor advertising signs; that the State's regulations are consistent with the type of signs that are customarily used to display messages along highways; that any ban on signs would "completely emasculate" the Act because the General Assembly stated that more severe restrictions on signs are inconsistent with the customary use standard in section 6; that any ban on signs would not be carrying out the purposes of the Act and that of the Beautification Act which is to promote the display of signs; and that, if the State were to permit dissimilar treatment of signs, like a sign ban here, it would not be effectively controlling signs, and consequently, this lack of statewide control "could jeopardize 10% of the [S]tate's share of the [F]ederal highway funds." (See 23 U.S.C. §131(b) (1970).) The City maintains that we should not address the validity of its ban on signs along limited access highways, because Scadron's 1,200 square foot sign exceeds the City's size limitation.

We reject the City's argument that we do not have to address the third question because of the size of Scadron's proposed sign. This question was tendered to us by the United States Court of Appeals for the Seventh Circuit and we agreed to answer it.

Having determined that the legislature has not taken specific action to limit the home rule power at issue here, we must next examine the relationship between the City's total ban on signs along limited access highways and the provisions of the Act. (See *John Sexton Contractors Co.*, 75 Ill. 2d at 508.) Under our constitution, great responsibility is placed on the legislature to ensure that home rule does not degenerate into provincialism. (1972 U. Ill. L.F. at 157.) Since the legislature has not specifically limited the power of home rule units to regulate outdoor advertising signs, Scadron is, in effect, asking this court to curtail the City's power by invalidating the City's sign ban. Professor Baum warned that under the circumstances here, "if the constitutional design is to be respected, the courts should step in to compensate for legislative inaction or oversight *only in the clearest cases of oppression, injustice, or interference by local ordinances with vital state policies.*" (Emphasis added.) 1972 U. Ill. L.F. at 157.

The vital State policy at issue here appears to be that Illinois must continue to effectively control outdoor advertising signs or it will lose 10% of its Federal highway funds. Scadron argues that if differing local sign regulations are allowed, the statewide customary use standard will not be followed and, as a consequence, the State's share of Federal highway funds could be reduced by 10%. (See 23 U.S.C. §131(b) (1970).) Miller Brewing Company, one of the *amici curiae*, argues that if more severe local regulations, like the City's ban here, are permitted to stand, the State will lose 10% of its Federal highway funds. (23 U.S.C. §131(b) (1970).) Miller Brewing Company asks us to take judicial notice of the fact that in 1992, Illinois has been apportioned $344.2 million in Federal highway funds; and if the 10% penalty would apply, Illinois would lose nearly $35 million.

The City characterizes Scadron's argument about any possible loss of Federal highway funds as "total fiction." The City considers it significant that Scadron cannot cite one case where a State which permitted stricter local regulation of signs lost Federal highway funds. Moreover, the City maintains that its regulations comport with the purposes of the Beautification Act wherein Congress declared that outdoor advertising signs "should be controlled in order to protect the public investment in such highways, to promote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. §131(a) (1970).

Resolution of the third question hinges on whether it clearly appears that, by allowing the City to ban signs, the State's vital policy of "effectively controlling" signs within the meaning of the Beautification Act will be thwarted, thus resulting in the loss of millions of Federal highway dollars. After considering the arguments noted above, together with the language of the Beautification Act and court decisions which have interpreted it (*Burkhart Advertising, Inc. v. City of Auburn, Indiana* (N.D. Ind. 1991), 786 F. Supp. 721; *Indiana State Highway Comm'n v. Amoco Oil Co.* (Ind. App. 1980), 406 N.E.2d 1222), this court finds that the City's sign ban will not clearly result in a finding by the United States Department of Transportation that Illinois is not effectively controlling outdoor advertising signs along the interstate highway system.

Scadron argues that Illinois entered into an agreement with the Secretary of the United States Department of Transportation wherein it agreed to effectively control signs consistent with customary use, meaning consistent with the standard size billboards used in the sign industry. Furthermore, Scadron argues that the legislative history of the Act (see *Dolson Outdoor Advertising Co.*, 46 Ill. App. 3d at 119-20) reveals that the legis-

lature intended to regulate signs consistent with customary use, otherwise the State could lose 10% of its Federal highway funds. Miller Brewing Company contends that the Act requires Illinois to control advertising in a manner consistent with the Beautification Act. Miller Brewing Company argues further that the Act and its Federal counterpart both disclose "the identical concerns." So, as its argument goes, if Illinois does not uniformly control outdoor advertising signs consistent with the customary use standards in the Beautification Act, a loss of Federal highway funds will result. In its reply brief, Scadron expressly adopts the arguments of the Miller Brewing Company.

After reading the plain language of the Act and the Beautification Act, we find that the concerns of these two pieces of legislation are not identical. It is true that the Act declares that outdoor advertising signs "should be regulated" (Ill. Rev. Stat. 1987, ch. 121, par. 501), and the Beautification Act similarly declares that outdoor advertising signs "should be controlled" (23 U.S.C. §131(a) (1970)). However, as mentioned earlier in this opinion, only the Act declares that outdoor advertising signs "should be allowed to operate in business areas" (Ill. Rev. Stat. 1987, ch. 121, par. 501). Thus, the City's sign ban will not offend the purposes of the Beautification Act, but only the State law.

Scadron directs this court's attention to subsection (d) of the Beautification Act. It contends that, according to this subsection, one of the purposes of the Federal statute is to promote the display of outdoor advertising signs, and any elimination of outdoor advertising signs is contrary to the Beautification Act. However, the language of subsection (d) is permissive in that it provides, in relevant part:

> "In order to promote the reasonable, orderly and effective display of outdoor advertising while remaining

consistent with the purposes of this section, signs *** *may* be erected and maintained within six hundred and sixty feet of the nearest edge of the right-of-way within areas *** which are zoned industrial or commercial under authority of State law ***." (Emphasis added.) (23 U.S.C. §131(d) (1970).)

Therefore, a State or local authority does not have to permit advertising signs in business or industrial areas located within 660 feet of interstate highways. *Amoco Oil Co.*, 406 N.E.2d at 1225.

Moreover, the Beautification Act expressly recognizes the right of State and local zoning authorities "to establish 'standards imposing stricter limitations with respect to signs, displays, and devices on the Federal-aid highway systems.' " (*Burkhart Advertising, Inc.*, 786 F. Supp. at 737, quoting 23 U.S.C. §131(k) (1970).) In *Burkhart Advertising, Inc.*, a city in Indiana banned off-premise advertising signs within city limits. A billboard company contended, *inter alia*, that the city's sign ban violated Indiana law. Indiana entered into an agreement with the United States Secretary of Transportation, whereby any local ordinance had to, at a minimum, conform to the size, lighting, and spacing standards articulated in the agreement. The United States district court concluded that the city could ban billboards altogether:

> "[A] zoning authority can completely ban billboards within the adjacent area. This court notes, observing the finding in *Amoco Oil Company*, that
>
> > Section 131(k) [of 23 U.S.C.] was designed to allow states to impose stricter limitations than those in the federal statute and to make it clear that the federal statute does not give a federal right to maintain advertising signs within the 660 foot strip."
>
> (*Burkhart Advertising, Inc.*, 786 F. Supp. at 738.)

This court finds that a home rule municipality's ban on signs will not clearly interfere with the State's policy of effectively controlling outdoor advertising signs so as to

comply with the Beautification Act. Thus, a 10% loss of Federal highway funds under subsection (b) of the Beautification Act will not clearly come about, either.

Section 6(i) of the Illinois Constitution of 1970 states that a home rule municipality can exercise its power concurrently with the State, provided the General Assembly by law does not specifically diminish its powers. In this case, the General Assembly has not taken any specific action to diminish the power of a home rule unit to regulate outdoor advertising signs in areas subject to the Act. Although the State regulates outdoor advertising signs under the Act, home rule municipalities have the power under section 6(a) of the 1970 Constitution to regulate such signs, too. "The fact that the state has occupied some field of governmental endeavor, or that home rule ordinances are in some way inconsistent with state statutes, is not in itself sufficient to invalidate the local ordinances." 1972 U. Ill. L.F. at 572.

In response to the questions certified by the United States Court of Appeals for the Seventh Circuit, we conclude:

(1) that the Act does not preempt the authority of home rule municipalities to regulate outdoor advertising signs in areas subject to the Act; and

(2) that home rule municipalities can totally exclude outdoor advertising signs in areas subject to the Act.

*Certified questions answered;*
*cause transferred.*