# Illinois Official Reports

## Supreme Court

---

### *Cammacho v. City of Joliet*, 2024 IL 129263

---

Caption in Supreme Court:
ROBERT CAMMACHO JR. *et al.*, Appellees, v. THE CITY OF JOLIET, Appellant.

Docket No.
129263

Filed
April 4, 2024

Decision Under Review
Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Will County, the Hon. John C. Anderson, Judge, presiding.

Judgment
Appellate court judgment affirmed in part and vacated in part.
Circuit court judgment reversed.
Administrative decisions reversed.

Counsel on Appeal
Todd C. Lenzie, Assistant Corporation Counsel, and Carl R. Buck, of Rathbun, Cservenyak & Kozol, LLC, both of Joliet, for appellant.

Frank P. Andreano and Eric A. Cobb, of Andreano Law PC, of Joliet, for appellees.

Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, and Alexandra Weiss, Assistant Corporation Counsel, of counsel), for *amicus curiae* City of Chicago.

Justices          JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Holder White, Cunningham, and Rochford concurred in the judgment and opinion.

Justice O'Brien took no part in the decision.

**OPINION**

¶ 1     Defendant, the City of Joliet (City), appeals the judgment of the appellate court that reversed administrative decisions by the City finding plaintiffs, Robert Cammacho Jr.,[1] James A. Jones, Bruce D. Oliver, David B. Speer, and Jorge Urbina, liable for noncompliance with the City's ordinances prohibiting overweight and/or overlength vehicles on nondesignated highways and imposing fines in accordance therewith. To resolve this appeal, this court has considered (1) whether section 1-2.1-2 of the Illinois Municipal Code (65 ILCS 5/1-2.1-2 (West 2020)) constitutionally preempts the City's home rule authority to "administratively adjudicate" violations of its ordinances[2] and (2) whether the ordinance violations at issue are properly subject to administrative adjudication under the Joliet Code of Ordinances.

¶ 2     In this opinion, we find that section 1-2.1-2 does not preempt the City's home rule authority to "administratively adjudicate"[3] violations of its ordinances and therefore does not constitute an appropriate basis to reverse the administrative decisions of the City's hearing officer. For this reason, we vacate that part of the appellate court's judgment and overrule that portion of the First District's opinion in *Catom Trucking, Inc. v. City of Chicago*, 2011 IL App (1st) 101146, ¶¶ 10-11, which held that the definition of "system of administrative adjudication" set forth in section 1-2.1-2 of the Municipal Code determines a home rule unit's authority to

---

[1]The lead plaintiff's last name is spelled multiple ways in the record; we follow here the spelling employed in the appellate court.

[2]For the first time in its opening brief before this court, the City raises the issue of whether section 1-2.1-2 of the Municipal Code (65 ILCS 5/1-2.1-2 (West 2020)) constitutionally preempts its home rule authority to "administratively adjudicate" its ordinances. In their response brief, plaintiffs do not acknowledge or address this constitutional issue. Considerations of forfeiture notwithstanding, we address the issue on the merits in the interests of justice and the development of a sound body of precedent. See *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, ¶ 94.

[3]The parties and the courts below defined the issue as whether the City has the authority to "administratively adjudicate" the ordinance violations here, so it is important that we identify a precise meaning of the term as it is being used herein. Black's Law Dictionary's definition of "administrative adjudication" has changed over time. In 1990, the term was defined as "[t]he process by which an administrative agency issues an order, such order being affirmative, negative, injunctive or declaratory in form." Black's Law Dictionary 45 (6th ed. 1990). However, it is currently defined as "[t]he process used by an administrative agency to issue regulations through an adversary proceeding." Black's Law Dictionary (11th ed. 2019). Here, we are asked to examine a home rule unit's authority to issue an administrative decision regarding the liability of plaintiffs for violation of its ordinances, rather than its authority to issue regulations. Thus, we refer to "administrative adjudication" as formerly defined.

administratively adjudicate ordinance violations.[4] However, we find the hearing officer's administrative decisions are precluded by the Joliet Code of Ordinances and thus affirm, on different grounds, that portion of the appellate court's judgment that reversed the judgment of the circuit court, as well as the administrative decisions of the City.

¶ 3                                          BACKGROUND
¶ 4                              A. Complaint for Administrative Review
¶ 5        Plaintiffs filed a complaint for administrative review in the circuit court of Will County, stating the following factual basis. The City is known as the "Crossroads of Mid-America" because two major interstates, I-80 and I-55, cross within its borders and Illinois Route 53, a north-south throughfare and designated Illinois truck route, services the City. The City is also the location of a major rail line intersection as well as the Chicago Area Waterway System (CAWS), which connects Lake Michigan to the Illinois River and ultimately to the Mississippi River and the Gulf of Mexico.

¶ 6        Due in large part to its location, the City was once home to a large United States Army ammunitions plant, which operated from World War II through the end of the Vietnam War. A large part of these former federal lands has been transferred to the Joliet Arsenal Development Authority (JADA), a body politic of the State of Illinois. See 70 ILCS 508/1 *et seq.* (West 2022). Over the years, JADA sold a large portion of this land to industrial businesses for redevelopment into logistics parks and transport facilities. As a result, there is significant traffic congestion, especially commercial truck traffic, which causes concerns for the citizens of the preexisting small communities and subdivisions on Illinois Route 53. The complaint for administrative review recognizes that, for this reason, the City enacted a comprehensive set of ordinances to address the concerns.

¶ 7        The City incorporates the Illinois Vehicle Code (625 ILCS 5/1-100 *et seq.* (West 2020)) into its ordinances (Joliet Code of Ordinances § 19-1 (eff. Oct. 20, 2020)), designates certain Joliet thoroughfares as approved truck routes (Joliet Code of Ordinances § 19-14 (eff. Dec. 1, 2015)), and prohibits commercial trucks from operating on any nondesignated state or local roadways (*id.* § 19-12). Further, the City posts multiple "No Trucks" signs along various arterial and residential streets that connect to Illinois Route 53 and has a "Truck Enforcement" division within its police department to monitor and enforce compliance with commercial trucking regulations.

¶ 8        The complaint states that plaintiffs are commercial truck drivers who traveled upon posted "No Truck" routes and upon nondesignated thoroughfares within the city and that the City consequently issued to them citations for violation of the applicable ordinances. Copies of

---

[4]As explained in detail later in this opinion, the purpose of section 1-2.1-2 of the Municipal Code (625 ILCS 5/1-2.1-2 (West 2020)) is to describe the parameters of a "system of administrative adjudication" that, if followed by a home rule municipality, would result in an order that is immediately enforceable in the same manner as a circuit court judgment. However, this is an appeal of the administrative decision itself, which the appellate court reversed on the basis that the hearing officer lacked jurisdiction to enter the order. A finding that the decision fails to comply with section 1-2.1-2 and thus does not qualify for immediate enforceability as a judgment does not constitute grounds to reverse the decision of the hearing officer finding plaintiffs liable for the ordinance violations and imposing fines. *Infra* ¶¶ 34-37.

- 3 -

these citations are contained in the record and contain the heading "City of Joliet Ordinance Violation Notice." They include a ticket number, date and time of issue, fine amount, the location of the violation, the relevant ordinance number, and a description of the violation. They list the make, model, and color of the vehicle involved; license plate number and state; vehicle identification number; and plaintiffs' names and addresses. They state a hearing date and time if the fine is not paid, with the hearing to take place in the Joliet Municipal Building. Finally, they contain instructions regarding payment of the fine, including how to pay, late fees, and a date on which an unpaid balance would be sent to a collection agency.

¶ 9        In the case of each ordinance violation, plaintiffs challenged the City's jurisdiction to administratively adjudicate the ordinance violations at issue, arguing plaintiffs were entitled to have the violations dismissed because applicable law required that they be adjudicated in the circuit court. The hearing officer overruled plaintiffs' objections and denied their motions to dismiss. Because plaintiffs stipulated the facts concerning their noncompliance with the ordinances, the hearing officer issued decisions finding plaintiffs liable for the violations and imposing fines.

¶ 10       Plaintiffs attached the decisions of the hearing officer to their complaint for administrative review. We set forth the content of the decisions in detail because the issue on appeal concerns the City's jurisdiction to issue the decisions. Each decision states that the matter had come on for hearing to determine plaintiffs' liability for the violation notice, the code department had jurisdiction over the parties and subject matter, due notice had been given, and the hearing officer had reviewed the evidence presented and was otherwise fully advised in the premises. The decisions order that plaintiffs are "liable"; identify the ordinance that plaintiffs violated by ordinance number and title (Joliet Code of Ordinances § 19-21 (eff. Dec. 17, 2019) ("Weight restrictions"); Joliet Code of Ordinances § 19-19 (eff. Dec. 1, 2015) ("Maximum length")); and set forth the "judgment total," "court cost," and "balance due." The decisions further provide that the fine was a "debt due and owing" to the City, that said total "must be paid," and that "payment of fines and penalties operates as a final disposition of the violation."

¶ 11       Instructions for paying the City online, by phone, by mail, and in person are included in the decisions, as well as a statement regarding late penalties for "failing to pay the indicated within 25 days of a determination of liability." Finally, the decision provides as follows:

> "The City of Joliet may use all lawful means of collecting this judgment including, but not limited to, booting and/or impoundment of your vehicle and/or suspension of your driving privileges (for vehicle related offenses)
>
> *Please contact the Joliet Legal Department at (815) 724-3794 if you have any questions regarding this notice.*
>
> This administrative order is authorized by City of Joliet ordinance and State of Illinois statute. You have a right to appeal this decision pursuant to the Illinois Administrative Review Law, 735 ILCS 5/3-101, *et seq.*, by filing a proper lawsuit against the City of Joliet and other necessary parties within 35 days of a final order. If you fail to pay fines, the City may proceed to collection." (Emphasis in original.)

¶ 12       The decisions indicate plaintiffs Cammacho, Jones, Oliver, Urbina, and Speer are liable for violations of section 19-21 of the Joliet Code of Ordinances (Joliet Code of Ordinances § 19-21 (eff. Dec. 17, 2019)), titled "Weight restrictions," in the amount of $750 plus $50 court costs, while plaintiffs Speer and Urbina are additionally liable for violations of section 19-19

of Joliet's ordinances (Joliet Code of Ordinances § 19-19 (eff. Dec. 1, 2015)), titled "Maximum length," in the amount of $500 plus $50 court costs. Plaintiffs requested that the circuit court vacate the City's imposition of these fines, that the administrative findings of liability be held for naught, and that the citations be dismissed. The circuit court rejected plaintiffs' request and affirmed the decisions.

B. Appellate Court Decision

The appellate court reversed the decisions of the circuit court and hearing officer. 2022 IL App (3d) 210591, ¶ 1. In so doing, the appellate court followed the First District's opinion in *Catom Trucking*, 2011 IL App (1st) 101146, ¶ 11 (quoting 65 ILCS 5/1-2.1-2 (West 2008)), which held that, pursuant to section 1-2.1-2 of the Municipal Code (65 ILCS 5/1-2.1-2 (West 2008)), home rule municipalities are prohibited from administratively adjudicating " 'traffic regulations governing the movement of vehicles,' " in addition to " 'reportable offense[s] under Section 6-204 of the Illinois Vehicle Code [(625 ILCS 5/6-204 (2008))].' " The appellate court here, like the First District in *Catom Trucking*, agreed with plaintiffs that the ordinance violations fit within the "traffic regulations governing the movement of vehicles" category and, as a result, that administrative adjudication by the City was prohibited by section 1-2.1-2, despite the parties' stipulation that they are not "reportable." *Catom Trucking*, 2011 IL App (1st) 101146, ¶ 11. Accordingly, the appellate court reversed the judgment of the circuit court and the administrative decisions. *Id.* ¶¶ 15-16, 30. This court granted the City's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021). We also allowed the City of Chicago to file an *amicus curiae* brief in support of the City's arguments on appeal. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

ANALYSIS

The City urges this court to reverse the decision of the appellate court, leaving the administrative decisions intact, for two reasons. First, the City argues that section 1-2.1-2 of the Municipal Code is not intended to be a limitation on a home rule municipality's authority to administratively adjudicate violations of its ordinances. Moreover, even if the General Assembly had such an intent when it enacted section 1-2.1-2 of the Municipal Code, the City argues the statute does not meet the requirements that article VII, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6) and section 7 of the Statute on Statutes (5 ILCS 70/7 (West 2022)) place on the General Assembly when it seeks to limit such authority. Second, the City argues that, even if section 1-2.1-2 of the Municipal Code were a constitutional limit on its home rule authority, administrative adjudication of the ordinances at issue is not prohibited by that section, as the ordinances are neither "traffic regulations governing the movement of vehicles" nor "reportable offense[s] under Section 6-204 of the Illinois Vehicle Code."[5] Because the City raises issues presenting questions of law involving

_____

[5]Because this court finds that section 1-2.1-2 of the Municipal Code (65 ILCS5/1-2.1-2 (West 2020)) is not a jurisdictional prerequisite to administrative adjudication of ordinance violations by a home rule municipality that would warrant reversal of the decisions, it does not have occasion to determine whether the appellate court decisions here and in *Catom Trucking* properly determined the ordinance violations for overweight vehicles were "traffic regulations governing the movement of vehicles." However, because the Joliet Code of Ordinances excepts "reportable" offenses from its code

statutory interpretation and/or constitutionality, we employ a *de novo* standard of review. See *Johnson v. Department of State Police*, 2020 IL 124213, ¶ 13.

¶ 17                    A. Home Rule Authority Under the Illinois Constitution

¶ 18    The parties stipulate that the City is a home rule unit. See Ill. Const. 1970, art. VII, § 6(a), (b) ("any municipality which has a population of more than 25,000 are home rule units" unless they elect by referendum not to be a home rule unit). This court has recognized the broad authority the 1970 Illinois Constitution bestows on home rule units. See *Lintzeris v. City of Chicago*, 2023 IL 127547, ¶ 20. As aptly explained by the City of Chicago in its *amicus* brief, under the previous constitutions of Illinois, all municipalities were bound by "Dillon's Rule," which provided that municipalities possess only those powers expressly granted by state law, powers incident to those expressly granted, and powers indispensable to the accomplishment of the declared objects and purposes of the municipal corporation. *Pesticide Public Policy Foundation v. Village of Wauconda*, 117 Ill. 2d 107, 112 (1987).

¶ 19    While the 1970 Constitution maintains Dillon's Rule with respect to non-home-rule units of government (see *id.*), it provides, with respect to home rule units, as follows:

> "Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs, including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt." Ill. Const. 1970, art. VII, § 6(a).

¶ 20    Article VII, section 6, contains specific requirements that must be followed by the General Assembly when it provides by statute for any limitation on home rule authority. While other subsections of section 6 provide additional instructions for limiting a home rule municipality's power to tax and incur debt specifically, instructions for limiting its governmental functions and powers in general are set forth in subsections (g), (h), (i), and (m) as follows:

> "(g) The General Assembly by a law approved by the vote of three-fifths of the members elected to each house may deny or limit the power to tax and any other power or function of a home rule unit not exercised or performed by the State other than a power or function specified in subsection (l) of this section.[6]
>
> (h) The General Assembly may provide specifically by law for the exclusive exercise by the State of any power or function of a home rule unit other than a taxing power or a power or function specified in subsection (l) of this Section.
>
> (i) Home rule units may exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State's exercise to be exclusive.
>
>                                    * * *

---

hearing unit's jurisdiction, we do incidentally determine, later in this opinion, that such ordinance violations are "reportable." *Infra* ¶¶ 49-50.

[6]Section 6(l) addresses the levying of taxes by special assessment for local improvements or for the provision of special services. See Ill. Const. 1970, art. VII, § 6(l).

(m) Powers and functions of home rule units shall be construed liberally." *Id.* § 6(g), (h), (i), (m).

¶ 21                    B. Applying Section 7 of the Statute on Statutes

¶ 22    Pursuant to the above-detailed subsections, the City's home rule authority to administratively adjudicate its city ordinance violations must be construed liberally but can be limited by the General Assembly by statute. *Id.*; see also *Lintzeris*, 2023 IL 127547, ¶¶ 22-23. However, such statutory limitations must be expressly stated. *Lintzeris*, 2023 IL 127547, ¶ 22. In fact, section 7 of the Statute on Statutes, which was effective in 1979 and has never been amended, provides:

> "No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit." 5 ILCS 70/7 (West 2022).

¶ 23    As *amicus* points out, pursuant to section 7 of the Statute on Statutes, when the General Assembly means to preempt home rule authority, it uses clear language to do so and cites the specific subsection of article VII, section 6, of the Illinois Constitution it is invoking. This is required because, as this court made clear in *Scadron v. City of Des Plaines*, 153 Ill. 2d 164, 186-89 (1992), if a statute does not expressly state that there is a limitation on home rule units specifically, the concurrent exercise of governmental power by a home rule unit will not be read to be restricted. There are countless examples of this specific language throughout the Illinois Compiled Statutes, including the Municipal Code. For example, section 1-2.1-2 of the Municipal Code (65 ILCS 5/1-2-1.2 (West 2020)) prohibits "[a] unit of local government, *including a home rule unit*," from enforcing any ordinance that prohibits driving under the influence of alcohol or other drugs. (Emphasis added.) Subsection (c) of that section specifically provides that it is "a denial and limitation of home rule powers and functions under subsection (g) of Section 6 of Article VII of the Illinois Constitution." *Id.* § 1-2-1.2(c); see also *id.* § 1-2-1.5 (prohibiting a municipality, including a home rule unit, from enacting an ordinance penalizing tenants who contact police or other emergency services and specifying that it is a limitation on such authority that was exercised by the General Assembly pursuant to subsection (g)). Thus, where the General Assembly seeks to limit the authority of a home rule municipality to tax, or to perform a function of government that the State does not itself perform, it references subsection (g). See *id.* §§ 1-2-1.2(c), 1-2-1.5(d).

¶ 24    The Illinois Compiled Statutes are replete with enactments that specify that they operate as limitations on home rule authority in accordance with the instructions set forth in the other subsections of article VII, section 6, of the Illinois Constitution as well. With respect to legislation that provides exclusively for State authority to perform a function of government, completely preempting home rule authority, the limiting statute references subsection (h) of article VII, section 6 (Ill. Const. 1970, art. VII, § 6(h)). See, *e.g.*, 720 ILCS 648/55 (West 2022) (providing the regulation of the sale of targeted methamphetamine precursors and targeted packages are exclusive powers and functions of the State). With respect to legislation that provides for a limitation on the concurrent exercise of power by the State and the home rule

municipality, the General Assembly references subsection (i) of article VII, section 6 (Ill. Const. 1970, art. VII, § 6(i)). See, *e.g.*, 70 ILCS 3720/0.05 (West 2022) (requiring municipalities, including home rule municipalities, to regulate water systems consistently with the provisions of the statute). The presence of this language and reference to a subsection of article VII, section 6, thus evidences the General Assembly's characterization of the statute as one operating as a limitation on home rule authority and indicates the subsection of article VII, section 6, it is intending to invoke.[7]

¶ 25                          C. Division 2.1 of the Municipal Code Is Not Jurisdictional

¶ 26     Having determined that any limitation on a home rule municipality's authority to exercise any function of government must be specifically set forth by the legislature, we turn to division 2.1 of the Municipal Code to ascertain whether such limitation is expressly included therein. The appellate court in the instant case, as well as in *Catom Trucking*, applied section 1-2.1-2 of the Municipal Code (65 ILCS 5/1-2.1-2 (West 2020)) to find that, because the ordinances at issue did not meet the criteria set forth in the definition of "system of administrative adjudication" contained therein, the City had no authority to make an administrative determination regarding plaintiffs' violations of the ordinances. In so doing, these courts did not consider whether that section is a constitutional limitation on the City's home rule authority or whether the General Assembly intended it as such. It is to these issues that we now turn.

¶ 27     Article 1, division 2, of the Municipal Code addresses municipal ordinances (*id.* art.1, div. 2), and article 1, division 2.1, is specifically titled "Administrative Adjudications" (*id.* art.1, div. 2.1). Thus, in assessing whether the City's home rule authority to administratively adjudicate violations of its ordinances has been constitutionally limited by the General Assembly, it is prudent to examine all provisions of article 1, division 2.1, including section 1-2.1-2, rather than considering that section in isolation. See *People v. Clark*, 2019 IL 122891, ¶ 20 (in conducting a plain language statutory interpretation analysis, a court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation).

¶ 28     Notably, section 1-2.1-1 provides that article 1, division 2.1, of the Municipal Code "applies only to municipalities that are home rule units." 65 ILCS 5/1-2.1-1 (West 2020). This is significant because much of the Municipal Code is directed toward all municipalities, as

---

[7]*Amicus* submits that, because the enforcement of local ordinances has not been exercised by the State, any limitation on such enforcement must be approved by three-fifths of the General Assembly and must reference subsection (g) of article VII, section 6. See Ill. Const. 1970, art. VII, § 6(g). As explained later in this opinion, however, a distinction must be made between adjudication and enforcement, as some ordinance violations are indeed adjudicated in the circuit court, even if the enforcement action is taken by the municipality. *Infra* ¶¶ 37-38. In fact, if a home rule unit wishes to enforce the fine imposed in the same manner as a circuit court judgment, it may be required to file an action in the circuit court if it does not meet the requirements of article 1, division 2.1, of the Municipal Code. 65 ILCS 5/art. 1, div. 2.1 (West 2020). Thus, adjudication of city ordinance violations may arguably be considered a concurrent power not requiring a three-fifths vote and reference to subsection (g) but, rather, requiring reference to subsection (i). In any event, article 1, division 2.1, of the Municipal Code contains no explicit limiting language or reference to article VII, section 6, so there is no need to determine which subsection would apply.

reflected in the general definition of "municipality" set forth in section 1-1-2 of the Municipal Code. *Id.* § 1-1-2(1). Thus, the General Assembly's intent that the provisions of division 2.1 apply exclusively to home rule municipalities is clear. However, it does not follow that the section was intended to operate as a limit on the authority a home rule municipality has to administratively adjudicate violations of its ordinances. Nor does it follow that, if it were so intended, the statute comports with the constitutional requirements for limiting such authority or the requirements contained in section 7 of the Statute on Statutes. See 5 ILCS 70/7 (West 2022). In fact, in reviewing division 2.1 as a whole, the opposite conclusion is apparent.

¶ 29        No provision of article 1, division 2.1, of the Municipal Code contains language providing that it is specifically limiting home rule municipality authority under any subsection of article VII, section 6 (Ill. Const. 1970, art. VII, § 6). In fact, multiple sections expressly indicate that the General Assembly did not intend to limit a home rule municipality's authority to enforce or adjudicate ordinance violations. First, section 1-2.1-3 provides that "[t]he adoption by a municipality of a system of administrative adjudication does not preclude the municipality from using other methods to enforce municipal ordinances." 65 ILCS 5/1-2.1-3 (West 2020). Second, section 1-2.1-9 provides that "[t]his Division shall not affect the validity of systems of administrative adjudication that were authorized by State law, including home rule authority, and in existence prior to the effective date of this amendatory Act of 1997." *Id.* § 1-2.1-9. Finally, section 1-2.1-10 provides specifically that "[t]his Division shall not preempt municipalities from adopting other systems of administrative adjudication pursuant to their home rule powers." *Id.* § 1-2.1-10. Thus, the provisions of division 2.1 notwithstanding, a home rule municipality may make liability determinations based on violations of its ordinances under any other system put into place before or after the enactment of division 2.1. *Id.*

¶ 30        Not only is division 2.1 replete with language indicating that it is not intended to limit home rule authority nor to supplant any system of administrative adjudication or other method of enforcing ordinance violations that a home rule municipality has in place, the language of section 1-2.1-2 itself contains no such indication:

> "Administrative adjudication of municipal code violations. Any municipality may provide by ordinance for a system of administrative adjudication of municipal code violations to the extent permitted by the Illinois Constitution. A 'system of administrative adjudication' means the adjudication of any violation of a municipal ordinance, except for (i) proceedings not within the statutory or the home rule authority of municipalities; and (ii) any offense under the Illinois Vehicle Code or a similar offense that is a traffic regulation governing the movement of vehicles and except for any reportable offense under Section 6-204 of the Illinois Vehicle Code." *Id.* § 1-2.1-2.

¶ 31        The courts below, as well as the appellate court in *Catom Trucking*, operated under the assumption that the exceptions set forth in the definition of "system of administrative adjudication" stated in section 1-2.1-2 describe categories of ordinance violations that the City is prohibited from administratively adjudicating. But section 1-2.1-2 does not contain the specific language required to operate as a limitation on the City's authority, and as set forth above, other sections within article 1, division 2.1, specifically state to the contrary. Accordingly, we find that the appellate court misapplied section 1-2.1-2 as a basis to determine the City did not have authority to issue administrative decisions finding plaintiffs violated the

city ordinances and imposing fines, and we vacate that portion of the appellate court's judgment that so held. Moreover, that portion of *Catom Trucking*, 2011 IL App (1st) 101146, ¶ 18, that found that the definition of "system of administrative adjudication" in section 1-2.1-2 determines whether a City has jurisdiction to administratively adjudicate ordinance violations, is hereby overruled.

¶ 32    While division 2.1 does not limit a home rule municipality's authority to administratively adjudicate violations of its ordinances, we previously noted that it does apply exclusively to administrative adjudications of ordinance violations by home rule municipalities. See 65 ILCS 5/1-2.1-1 (West 2020). Thus, while not a jurisdictional provision, section 1-2.1-2 provides that some ordinance violations are outside of a "system of administrative adjudication" to which division 2.1 applies. Accordingly, whether the ordinances at issue fall within that definition must have some purpose, if not jurisdictional. In order to ascertain the purpose of section 1-2.1-2 of the Municipal Code and determine whether it has any bearing on the propriety of the administrative decisions before us, we turn to the remaining provisions of article 1, division 2.1.

¶ 33                    D. Article 1, Division 2.1, Provides Enforcement Incentives
                              to Home Rule Units

¶ 34    Provided that an ordinance violation does not fall within the excepted violations provided in section 1-2.1-2, section 1-2.1-4 of the Municipal Code establishes requirements a city must meet in establishing a "system of administrative adjudication, pursuant to [that] Division." *Id.* § 1-2.1-4(a). These include establishing a code hearing unit within city government and providing by ordinance for the jurisdiction of that unit that is consistent with division 2.1. *Id.* An adjudicatory hearing held pursuant to division 2.1 must be presided over by hearing officers with power and authority to consider testimony and other evidence, subpoena witnesses, and preserve a record of proceedings. *Id.* § 1-2.1-4(b)(1)-(3).

¶ 35    Section 1-2.1-5 provides that an ordinance establishing "a system of administrative adjudication, pursuant to [that] Division" must afford parties due process of law by providing notice and opportunity for a hearing as provided for in that section. *Id.* § 1-2.1-5(a). Section 1-2.1-6 provides that formal rules of evidence do not govern "in an adjudicatory hearing permitted under this Division." *Id.* § 1-2.1-6. Finally, section 1-2.1-7 provides that any decision of a hearing officer is final for purposes of judicial review and that such decision is subject to review under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)). 65 ILCS 5/1-2.1-7 (West 2020).

¶ 36    If a home rule unit of government establishes a "system of administrative adjudication" as defined in section 1-2.1-2 of the Municipal Code and that system meets all the requirements set forth in sections 1-2.1-3 through 1-2.1-7, then section 1-2.1-8 provides mechanisms for enforcement of an administrative decision entered using such a system. See *id.* § 1-2.1-8. It is within this section that we find the purpose of division 2.1, as it confers enforcement incentives on those home rule municipalities that administratively adjudicate ordinance violations in accordance with its terms.

¶ 37    Pursuant to section 1-2.1-8(b),

> "[a]fter expiration of the period in which judicial review under the Illinois Administrative Review Law may be sought for a final determination of a code

violation, unless stayed by a court of competent jurisdiction, the findings, decision, and order of the hearing officer may be enforced in the same manner as a judgment entered by a court of competent jurisdiction." *Id.* § 1-2.1-8(b).

Similarly, under section 1-2.1-8(d), the home rule municipality is able to record a lien on the real estate or personal estate, or both, in accordance with state law, and that lien may be enforced in the same manner as a judgment lien pursuant to a judgment of a court of competent jurisdiction. *Id.* § 1-2.1-8(d). Such remedies would otherwise not be available to the City until it initiated a civil action in the circuit court to collect the fine it has imposed. See *Village of Lake in the Hills v. Niklaus*, 2014 IL App (2d) 130654, ¶ 21 (without the enforcement mechanism set out in article 1, division 2.1, of the Municipal Code, a municipality would have to commence another action in circuit court to convert the administrative decision into a collectible judgment, thereby vitiating the incentive to use an administrative adjudication system).

¶ 38    Based on the foregoing, we find that a home rule municipality's conformity with section 1-2.1-2 of the Municipal Code when administratively adjudicating an ordinance violation determines whether the enforcement mechanisms set forth in section 1-2.1-8 are available to it without the need to proceed with the additional step of proving the violation in the circuit court in order to obtain a court judgment.[8] See *id.* However, section 1-2.1-2 does not provide a basis to divest a home rule municipality of jurisdiction to hold an administrative hearing to determine whether its ordinances have been violated or to impose a fine in accordance therewith.[9] Nevertheless, our finding that the appellate court erred in reversing the decisions of the hearing officer based on section 1-2.1-2 of the Municipal Code does not completely resolve the issue of the hearing officer's jurisdiction because, in the alternative, plaintiffs argue that the Joliet Code of Ordinances does not allow for an administrative adjudication of these ordinance violations. Thus, we turn to the Joliet Code of Ordinances to determine whether the hearing officer's decisions should be reversed based on this alternative jurisdictional argument.

¶ 39                              E. Joliet Code of Ordinances

¶ 40    Article I of chapter 3 of the Joliet Code of Ordinances is titled "Administrative Adjudication Code." See Joliet Code of Ordinances § 3-2 (adopted May 15, 2018). Its purpose is to "provide a fair and efficient method of the enforcement of municipal regulations through

---

[8]Article 1, division 2.1, of the Municipal Code is not the only statutory provision providing benefits to home rule municipalities that administratively adjudicate ordinance violations in accordance with its provisions. Section 11-208.3 of the Vehicle Code (625 ILCS 5/11-208.3 (West 2020)) allows for administrative adjudication by municipalities of traffic regulations concerning the standing, parking, or condition of vehicles; automated traffic law violations; and automated speed enforcement system violations in conformity with that section, resulting in the ability of the municipality to obtain a judgment in the circuit court in a shortened proceeding.

[9]A request for modifications to an administrative decision by a home rule municipality that fails to meet the criteria in section 1-2.1-2 of the Municipal Code (65 ILCS 5/1-2.1-2 (West 2020)) may be proper if such modifications are necessary to clarify that the decision does not have the force and effect of a court judgment pursuant to section 1-2.1-8 (*id.* § 1-2.1-8). However, reversal based on the municipality's lack of jurisdiction to make an administrative determination regarding an ordinance violation is improper for the reasons stated.

the administrative adjudication of violations of the municipal code and establish the authority and procedures for the collection of unpaid fines and penalties." *Id.* § 3-1(a). Article I establishes a "code hearing unit," consisting of an "administrative hearing officer, and other persons designated by the city manager to assist the administrative hearing officer in the performance of official duties." *Id.* § 3-3.

¶ 41    Section 3-5 of the Joliet Code of Ordinances governs the prosecution of offenses pursuant to local ordinance and provides:

"(a) Whenever a member of the Joliet Police Department charges an individual with any offense which is listed in the Code of Ordinances, or is a violation of the Illinois Vehicle Code which has been adopted by section 19-1 of this Code, the manner of charging shall be done pursuant to this section.

(b) The violator shall be issued either a notice of violation or a uniform traffic citation.

(c) The notice of violation shall be issued in the case of a violation of a non-traffic related (non-reportable) violation of the Code of Ordinances. Issuance of a notice of violation shall be done in conformity with this article.

(d) A uniform traffic citation shall be issued in the case of a violation of a reportable offense of the Illinois Vehicle Code, pursuant to section 19-1 of this Code.

(e) Any traffic offense requiring reporting to the Secretary of State shall be returnable to the Will County Court House on the applicable return date.

(f) Any other ordinance violation or traffic offense which does not require reporting to the Secretary of State, shall have a return date in the City Council Chambers of Joliet City Hall[,] 150 W. Jefferson Street." *Id.* § 3-5.

¶ 42    Section 3-5 of the Joliet Code of Ordinances thus delineates whether an ordinance violation is to be adjudicated through the circuit court or through the City's administrative process. Traffic offenses requiring reporting to the secretary of state are required to be prosecuted in the circuit court, while "[a]ny other ordinance violation or traffic offense which does not require reporting to the Secretary of State" is to be adjudicated through the City's administrative process. *Id.* Accordingly, the City has provided adjudicatory authority to its hearing officers based on whether the ordinance violations at issue are required to be reported to the secretary of state.

¶ 43    Based on the foregoing, the question of whether the ordinance violations are required to be reported to the secretary of state pursuant to state law is a determinative inquiry, but the determination is not properly based on section 1-2.1-2 of the Municipal Code but, rather, is based on the City's enactment of section 3-5 of the Joliet Code of Ordinances.[10] Pursuant to section 3-5, if the ordinance violations are "reportable offenses," violators are to be issued a uniform traffic citation with appearance required in the circuit court should the violator not

_____

[10] While the City may have imposed the "reportable offense" requirement for administrative adjudication to ensure that the hearing officer's decision could be enforced using mechanisms otherwise solely available to circuit court judgments as set forth in section 1-2.1-8 of the Municipal Code (65 ILCS 5/1-2.1-8 (West 2020)), it remains important to distinguish the issue of enforceability from the issue of jurisdiction due to the constitutional protections on home rule unit authority discussed above. *Supra* ¶¶ 19-20.

pay the fine by the return date. To determine whether the ordinances are "reportable offenses," we turn to section 6-204 of the Vehicle Code (625 ILCS 5/6-204 (West 2020)).

¶ 44                                    F. Reportable Offenses Committed by
                                          Drivers of Commercial Vehicles

¶ 45      Subsection (a) of section 6-204 of the Illinois Vehicle Code imposes a duty on the clerk of the circuit court to forward records of convictions for enumerated offenses to the secretary of state, who is tasked with canceling, revoking, or suspending driver's licenses. *Id.* § 6-204(a). Pursuant to subsection (a)(2), this duty applies "[w]henever any person is convicted of any offense under [the Vehicle Code] or similar offenses under a municipal ordinance, other than regulations governing standing, parking or weights of vehicles," and excepting a long list of enumerated sections of the Vehicle Code. *Id.* § 6-204(a)(1).

¶ 46      The parties present opposing arguments regarding whether the ordinances at issue here are "regulations governing standing, parking or weights of vehicles," for purposes of determining whether the violations are required to be reported. However, in the context of commercial motor vehicles, this inquiry is irrelevant because the final sentence of section 6-204(a)(2) of the Vehicle Code controls the issue of whether these ordinance violations are required to be reported to the secretary of state and, thus, are required by the Joliet Code of Ordinances to be adjudicated in the circuit court:

          "The reporting requirements of this subsection (a) apply to all violations listed in paragraphs (1)[11] and (2) of this subsection (a), excluding parking violations, when the driver holds a CLP or CDL,[12] regardless of the type of vehicle in which the violation occurred, or when any driver committed the violation in a commercial motor vehicle as defined in Section 6-500 of this Code." *Id.* § 6-204(a)(2).

¶ 47      Under the plain language of this provision, all Vehicle Code violations and "similar" ordinance violations, except parking violations, are required to be reported to the secretary of state when committed by a commercial learner's permit (CLP) or commercial driver's license (CDL) holder in any vehicle or when committed by any driver in a commercial motor vehicle as defined by section 6-500 of the Vehicle Code (*id.* § 6-500). See *id.* § 6-204(a)(2). Section 6-500(6)(A) of the Vehicle Code defines " '[c]ommercial motor vehicle' " as "a motor vehicle or combination of motor vehicles used in commerce," with exceptions not applicable here, if the vehicle is designed to transport passengers or property and meets minimum weight requirements. *Id.* § 6-500(6)(A). These requirements are

---

[11]Section 6-204(a)(1) requires reporting to the secretary of state in the case of all convictions where the Vehicle Code requires the offender's driver's license or permit to be suspended. See 625 ILCS 5/6-204(a)(1) (West 2020).

[12] A CLP is a commercial learner's permit, which authorizes a driver to practice driving a commercial motor vehicle with a qualified CDL holder sitting in the passenger seat. "How Do I Get a Commercial Driver's License?" U.S. Dep't of Transp., https://www.fmcsa.dot.gov/registration/ commercial-drivers-license/how-do-i-get-commercial-drivers-license (last visited Mar. 6, 2024) [https://perma.cc/S5L7-VR2Y]. A CDL is a commercial driver's license, which is issued to a CLP holder after 14 days, completion of applicable entry-level driver training, and satisfactory completion of all three parts of a federally mandated skills test. *Id.*

- 13 -

"a gross combination weight rating or gross combination weight of 11,794 kilograms or more (26,001 pounds or more), whichever is greater, inclusive of any towed unit with a gross vehicle weight rating or gross vehicle weight of more than 4,536 kilograms (10,000 pounds), whichever is greater; or

*** has a gross vehicle weight rating or gross vehicle weight of 11,794 kilograms (26,001 pounds or more), whichever is greater[.]" *Id.* § 6-500(6)(A)(i), (i-5).

¶ 48    Here, plaintiffs' complaint for administrative review alleges that they are commercial truck drivers and that they drove semitractor trailers over nondesignated roads in the City. Thus, it is established that plaintiffs were CDL holders at the time of their violations.[13] Because plaintiffs are CDL holders, section 6-204 of the Vehicle Code requires reporting to the secretary of state of all violations of the Vehicle Code and "similar" local ordinance violations they commit other than parking violations.[14] *Id.* § 6-204. It is to the issue of "similarity" that we now turn.

¶ 49    The City argues that the ordinances at issue, which regulate the weight and length of vehicles driving over nondesignated roads, are not similar to any provision of the Vehicle Code. In so doing, the City points to differences in the method it uses to measure the weight of vehicles, the maximum weight allowed, and the designation of specific truck routes in the City, compared to weight restrictions in the Vehicle Code. However, section 6-204 of the

---

[13]Plaintiffs also conceded that the semitractor trailers they were driving exceeded the weight limit imposed for nondesignated routes in Joliet Code of Ordinances section 19-21 (Joliet Code of Ordinances § 19-21 (eff. Dec. 17, 2019)). That ordinance prohibits vehicles with a weight or weight rating in excess of 24,000 pounds (12 tons). *Id.* § 19-21(a). Thus, the record does not establish with certainly that the tractor trailers they were driving exceeded the 26,000-pound weight or weight rating required to meet the definition of "commercial motor vehicle" set forth in section 6-500(6) of the Vehicle Code (625 ILCS 5/6-500(6) (West 2020)). Thus, it cannot be established by the record that violations by any driver of the semitractor trailers would be required by the Vehicle Code to be reported to the secretary of state and thus required by Joliet Code of Ordinances section 3-5 (Joliet Code of Ordinances § 3-5 (adopted May 15, 2018)) to be adjudicated in the circuit court. However, because the record establishes that plaintiffs are commercial truck drivers, it is established that they either hold CLPs or CDLs, and their violations are required to be reported regardless of the vehicle that they are driving. See 625 ILCS 5/6-204 (West 2020).

[14]*Amicus* argues that the provision in section 6-204 of the Vehicle Code (625 ILCS 5/6-204 (2020)) requiring reporting of all violations listed in section 1040.20(b) of Title 92 of the Illinois Administrative Code (92 Ill. Adm. Code 1040.20(b) (eff. Feb. 24, 2023)), except parking violations, when the offender is driving a commercial vehicle or holds a CDL or CLP, clarifies that section 1040.20(b) applies to commercial drivers and commercial vehicles, rather than requiring that all offenses listed in section 1040.20(b), excluding parking violations, be reported when committed by a commercial driver or in a commercial vehicle. According to this argument, because one of the exclusions listed in section 1040.20(b), section 11-1419.01 of the Vehicle Code (625 ILCS 5/11-1419.01 (West 2020)), applies only to commercial vehicles, that exclusion would be superfluous under our interpretation of the provision. However, section 11-1419.01 applies to "motor carriers" as well as "commercial vehicles," with a "motor carrier" defined as any person engaged in transportation of passengers or property in a motor vehicle for hire. See *id.* § 18c-1104(19). Thus, *amicus*'s argument is unsubstantiated. To the contrary, interpreting the provision as *amicus* suggests would render the exclusion of parking violations from commercial driver and commercial vehicle reporting requirements superfluous, as such violations are already excluded under section 1040.20(b). *Id.* § 11-1419.01.

Vehicle Code mandates reporting of violations of "similar" local ordinances, not identical ones. Thus, we agree with plaintiffs that the Vehicle Code regulates the movement of vehicles over a certain weight or length, and thus the City's ordinances, restricting the weight and length of vehicles over certain roads within the City, are similar to those provisions. Compare *id.* § 15-111 (establishing the maximum weight per axle), with Joliet Code of Ordinances § 19-21 (eff. Dec. 17, 2019); compare 625 ILCS 5/15-107 (West 2020) (establishing the maximum length of a vehicle), with Joliet Code of Ordinances § 19-19 (eff. Dec. 1, 2015).

¶ 50    In sum, we find that violations of the ordinances at issue are "reportable" as that term is used in section 6-204 of the Vehicle Code (625 ILCS 5/6-204 (West 2020)), as well as in section 3-5 of the Joliet Code of Ordinances (Joliet Code of Ordinances § 3-5 (adopted May 15, 2018)). As such, the Joliet Code of Ordinances required that plaintiffs be issued uniform traffic citations, rather than notices of ordinance violation, and that plaintiffs be required to appear in the circuit court to have their objection adjudicated, rather than at the City's code hearing unit. *Id.* For these reasons, we find that the Joliet Code of Ordinances did not confer jurisdiction on the hearing officer to administratively adjudicate the ordinance violations. Thus, the appellate court was correct to reverse the judgment of the circuit court and the decisions of the hearing officer, albeit on different grounds, and we affirm that part of the appellate court's judgment that did so.

¶ 51                                    CONCLUSION

¶ 52    Based on the foregoing, we reiterate that section 1-2.1-2 of the Municipal Code (65 ILCS 5/1-2.1-2 (West 2020)) does not preempt the City's home rule authority to administratively adjudicate violations of its ordinances and, therefore, does not constitute an appropriate basis to reverse the administrative decisions of the City's hearing officer. Rather, the purpose of that section is to describe the parameters of a system of administrative adjudication that will result in a judgment that is enforceable without further action in the circuit court to prove the violation, an issue that is separate from the authority of the home rule municipality to issue the administrative determinations themselves.

¶ 53    For these reasons, we vacate that part of the appellate court's judgment holding that a home rule municipality lacks jurisdiction to administratively adjudicate ordinances failing to meet the definition of " 'system of administrative adjudication' " set forth in section 1-2.1-2. *Id.* Nevertheless, we find the hearing officer's administrative decisions are precluded by section 3-5 of the Joliet Code of Ordinances (Joliet Code of Ordinances § 3-5 (adopted May 15, 2018)) and thus affirm, on different grounds, that part of the appellate court's judgment that reversed the judgment of the circuit court and reversed the administrative decisions entered by the City's hearing officer.

¶ 54    Appellate court judgment affirmed in part and vacated in part.

¶ 55    Circuit court judgment reversed.

¶ 56    Administrative decisions reversed.

¶ 57    JUSTICE O'BRIEN took no part in the consideration or decision of this case.